Dr. Werner OSWALD, Plaintiff,

v.

Jane B. ALLEN, Defendant.

No. 64 Civ. 3482.

United States District Court
S. D. New York.

June 11, 1968.

L. Reyner Samet, New York City, of counsel, for plaintiff.

Parker, Duryee, Zunino, Malone & Carter, New York City, for defendant; by Sidney D. Rosoff, and Stephen Charnas, New York City, of counsel.

## FINDINGS AND OPINION

POLLACK, District Judge.

### Contentions

Plaintiff seeks specific performance of an alleged contract calling for delivery by the defendant of all Swiss coins owned by defendant upon the payment of $50,-000 by the plaintiff.[1]

The defendant alternatively asserts that (1) the minds of the parties never met on the subject matter of the alleged agreement and no contract was thus entered into by the parties; and (2) even if an oral contract existed, its enforcement is barred by the applicable Statute of Frauds (New York Personal Property Law, McKinney's Consol. Laws, c. 41, Section 85, subd. 1(a)), as it exist-ed on the date of the alleged agreement, April 7, 1964.

### Findings of Fact

1. Jurisdiction exists by reason of diversity of citizenship, the plaintiff being a citizen of Switzerland and the defendant a citizen of New York. The amount in controversy exceeds the sum of $10,000 exclusive of interest and costs.

2. Defendant was the owner of several collections of valuable coins which had belonged to her father and uncle. When the coins came into defendant's possession, they had already been separated into the "Swiss Coin Collection", the "Rarity Coin Collection", the "German Ecclesiastical Collection", and other collections. The separate collections were contained in cigar boxes bearing identifying labels. Each coin in each collection was in a separate small envelope marked with a key number representing the coin collection to which it belonged. A detailed perpetual type inventory was maintained for the "Rarity Coin Collection". The defendant's collections were housed in the vaults of the Morgan Guaranty Trust Company in New York City and the Newburgh Savings Bank in Newburgh, New York. The "German Ecclesiastical Coin Collection" was located at the former bank and the "Rarity Coin Collection" and the "Swiss Coin Collection" were located in separate locked vault boxes at the latter.

3. Prior to April 4, 1964, Mr. Francesco Cantarella, an employee of the Chase Manhattan Bank in charge of the Bank's "Money Museum", telephoned the defendant, Mrs. Jane B. Allen, to express the interest of the plaintiff, Dr. Werner Oswald, in purchasing the Swiss collection from Mrs. Allen.

4. On April 6, 1964 the parties met at the Morgan Guaranty Trust Company where the plaintiff examined the defend-

---

1. This Court (per Sugarman, Ch. J.) enjoined the defendant *pendente lite* from disposing of the subject matter of this action, "a collection of rare Swiss coins", upon the condition that the plaintiff post "a bond for $25,000 for the payment of such costs and damages as may be incurred by the defendant should the defendant prevail in this action. F.R.Civ.P. 65(c)". Federal Insurance Company undertook such bond, which was filed in this action on April 7, 1965.

ant's "German Ecclesiastical Coin Collection". These were housed in boxes which bore the catalogue key number "37" as well as an individual identification number. After an examination lasting approximately two hours, Dr. Oswald called attention to the so-called Wallis Ducat which he considered to be "Swiss" and which he thought properly belonged with a "Swiss Collection". Mrs. Allen thereupon removed this coin from the "German Ecclesiastical Collection" intending to add it to her "Swiss Collection".

5. On April 7, 1964, Mrs. Allen and Dr. Oswald accompanied by Mr. Cantarella, Mrs. Allen's two sons, and Dr. Oswald's brother, Victor Oswald, went to the Newburgh Savings Bank where Dr. Oswald for a period of about four hours inspected coins contained in cigar boxes labelled "Switzerland"; he made three pages of notes on the coins he examined. Each such coin was contained in a small envelope bearing the key number "68" as well as an individual identification number.

6. When that examination was completed, Mrs. Allen asked Dr. Oswald whether he would be interested in seeing some of the coins in her "Rarity Collection". He replied in the affirmative and was shown two cigar boxes labelled "Rarities" containing a large number of highly valuable coins of many different countries. He looked particularly at a dozen or so coins, some of Swiss origin. All of these coins were in individual envelopes each of which bore the key number "62" in addition to an individual identification number. Dr. Oswald's inspection of the "Rarities" did not include all of the Swiss coins contained in this collection.

7. Dr. Oswald added at the foot of his notes on the coins in the "68" key number collection, a listing of ten Swiss coins, six of which he had seen in the "62" key number collection, which number identified the "Rarity Collection" items. One of the ten items added to Dr. Oswald's list was the Wallis Ducat from the "German Ecclesiastical Collection" mentioned above and bearing the key number "37" on the envelope containing it. The remaining three items added to the list were not identified in the evidence.

8. Following this inspection the parties motored back to New York City. During the trip Victor Oswald, acting as agent and interpreter for his brother, offered to purchase the Swiss coin collection from Mrs. Allen for $40,000. Dr. Oswald believed that he was thereby offering to purchase those coins contained in envelopes bearing the key number "68" contained in boxes bearing the stamp "Switzerland" and the Wallis Ducat (bearing key number "37"), and those Swiss coins shown to him from the "Rarity Collection" (bearing key number "62"), and all other coins of Swiss origin in Mrs. Allen's possession.

9. Mrs. Allen counter-offered to accept $60,000 for her "Swiss Coin Collection" which she believed to consist of approximately 2,400 coins all in envelopes bearing the key number "68" and housed in boxes marked "Switzerland" plus the Wallis Ducat in an envelope bearing the key number "37".

10. After some negotiation, the parties agreed on a price of $50,000 for the coins to be sold.

11. The understanding of each party differed as to the subject of the sale which was the "Swiss Coin Collection"; and at no time was there a mutual assent or meeting of the minds as to which coins were included among those to be delivered. Neither party had reason to know that the term "Swiss Coin Collection" might bear a meaning to the other party different from the one which he or she attached thereto and the phrase is uncertain and ambiguous.

12. According to uncontradicted expert testimony at the trial, the Swiss coins in Mrs. Allen's "Rarity Collection" (key number "62") had in April 1964, a value of $62,000 and the Swiss coins in the "Swiss Coin Collection" (key number "68") had a value of at least $50,000.

13. On April 8, 1964, Dr. Oswald wrote a letter to Mrs. Allen to confirm

his purchase. In addition to a statement of the method of delivery and payment in general terms, the letter recited the quantity of the coins sold as "all your Swiss coins (gold, silver and copper)" and the price as "$50,000."

14. Mrs. Allen arranged to go to Newburgh on or about April 24, 1964 to deliver her "Swiss Coin Collection" to Dr. Oswald's agent Mr. Cantarella.

15. On April 15, 1964, Mrs. Allen wrote to Dr. Oswald to thank him for sending her a plant. This is the only writing signed by the defendant in which she refers to the coin transaction in any way. The relevant part of that letter reads as follows:

"Mr. Cantarella and I have arranged to go to Newburgh Friday April 24th".

There is no indication in the letter signed by defendant of the contract of sale or of the quantity of coins sold.

16. On April 16 or 17, 1964 John Hall Allen, the defendant's husband, advised Mr. Cantarella on the defendant's behalf that her original estimate of the size of the "Swiss Coin Collection" was erroneous and that Mrs. Allen now estimated that the "Swiss Coin Collection" consisted of approximately 1,500 rather than 2,400 coins, 400 of which were gold, 800 silver and 300 copper. These were the coins contained in the seven full boxes and one half-filled box which Dr. Oswald had examined in whole or in part at Newburgh. Mr. Allen also advised Mr. Cantarella that Mrs. Allen might locate another box belonging to the "Swiss Coin Collection" which she would turn over to Dr. Oswald. This information was conveyed in turn to Dr. Oswald.

17. On April 20, 1964, Mr. Allen, as agent for the defendant, advised Mr. Cantarella, as agent for the plaintiff, that the defendant would permit the plaintiff or his representative to re-examine the coin collection to be sold before concluding the sale and the defendant would agree not to sell the coins to anyone else before such re-examination.

18. On the same day, another agent of Dr. Oswald, Alfred W. Barth, advised Mrs. Allen by letter that Dr. Oswald wished to proceed with the transaction without a re-examination of the coins. In that letter Mr. Barth said:

" * * * Just a few days ago you advised Mr. Cantarella that to your knowledge you have about 400 gold, 800 silver and 300 copper Swiss coins, but that another full cigar box may be possibly located later on. I notified Dr. Oswald to that effect by cable and he has instructed me to authorize payment of $50,000.—by his check to your order against delivery of the coins presently available. He does this in view of the understanding he apparently reached with you and which in his cable he expresses as follows:

'Even later on Mrs. Allen will deliver to me through Chase Manhattan Bank any further Swiss coins which should turn up because under our payment agreement she sold me all the Swiss coins which she had at the time of my visit. Victor and I just received an amicable letter from Mrs. Allen.'

As already agreed, Mr. Cantarella will take delivery of the coins coming Friday. As, however, my Bank acts as agent for Dr. Oswald, I believe it is necessary to have your agreement to his understanding as expressed above. This, naturally a mere formality, can be given by your signature on the attached copy of this letter * * *."

19. Mrs. Allen did not sign or return the attached copy of said letter as requested and did not agree to the understanding expressed therein. After receiving Mr. Barth's letter, Mrs. Allen refused to proceed with the sale since her understanding of the sale differed from Dr. Oswald's as quoted in Mr. Barth's letter. On April 23, 1964, Mr. Allen, as agent for the defendant, conveyed Mrs. Allen's refusal to Mr. Barth.

20. Conflicting testimony raised issues of credibility and these are resolved

in favor of the defendant on the basis of the demeanor evidence, the circumstances and the probabilities.

### Conclusions of Law

1. The minds of the parties never met on the subject matter of the alleged contract; each side conceived of the contents of the "Swiss Coin Collection" differently and neither side had reason to know that this description might bear a different meaning to the other party than that which he/she attached to it and consequently neither knew of the ambiguity inherent in that description. I conclude, therefore that there was no contract between the parties.

2. No sufficient memorandum to satisfy the applicable Statute of Frauds was signed by the defendant or her authorized agent.

3. The defendant is entitled to judgment dismissing the complaint on the merits, with costs.

### OPINION

■ Dr. Oswald neither speaks nor understands the English language and had no direct conversation with the defendant. The negotiation was carried on by his brother who translated Mrs. Allen's statements to Dr. Oswald. The latter gave a meaning to Mrs. Allen's offer to sell her "Swiss Coin Collection" which she did not intend, i. e., that her offer included all the Swiss coins which she had including those in her "Rarity Collection" (bearing key number "62"). Thus, plaintiff believed that he had offered to buy all Swiss coins owned by the defendant while defendant reasonably understood the offer which she accepted to relate to those of her Swiss coins as had been segregated into the particular collection denominated by her as the "Swiss Coin Collection" (bearing key number "68") plus the Wallis Ducat which plaintiff, an expert, recommended should be added to this collection.

It is inconceivable that the defendant intended the delivery of all of her Swiss coins for $50,000. when the few Swiss coins in the "Rarity Collection" themselves were valued at $62,000. and the 1,500 coins in the collection denominated as "Swiss Coin Collection" themselves were of the fair value of at least $50,000.

The classic case of Raffles v. Wichelhaus, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex. 1864), is in point.[2] There, the parties ".contracted" for a shipment of cotton to come from Bombay to London aboard the ship *Peerless*. Two ships, both named *Peerless*, departed for London from Bombay within two months of each other and each party intended that the cotton be shipped on a different *Peerless*. Since, as in the instant case, neither party had reason to know of the latent ambiguity, the Court held that the minds of the parties had not met and no contract existed.

■ Mrs. Allen's letter of April 15, 1964, the only signed memorandum with which to satisfy the requirements of the Statute of Frauds here involved, failed to indicate (i), the existence of a contract or (ii), the quantity of coins sold, both of which are required by Section 85, subd. 1(a) of the New York Personal Property Law, now recast as § 2–201 of the Uniform Commercial Code. Courts are "reluctant to interpret the parties into a contractual status" (United States v. Braunstein, 75 F.Supp. 137 (S.D.N.Y. 1947), app. dism., 168 F.2d 749 (2 Cir. 1948)). In this case the ingredients for such interpretation are lacking in the memorandum signed by the defendant.

Section 85, subd. 1(a) of the New York Personal Property Law, which was in

2. Surprisingly, the rule of this venerable case, although "firmly fixed in the law of contracts by the unanimous consent of courts and text-writers", has seldom been applied in the United States by direct citation of *Raffles* itself. The doctrine of the case has, however, been embodied in § 71 of the Restatement of Contracts and in § 21A of the Restatement of Contracts Second. For an excellent discussion of the implications and scope of the *Raffles* case in historical perspective see Young, Equivocation in Agreements, 64 Colum.L.Rev. 619 (1964).

effect at the time of the alleged contract, states in relevant part that there must be " * * * some note or memorandum in writing signed by the party to be charged or his agent in that behalf, sufficient to indicate that a contract to sell or a sale has been made between the parties and showing the quantity of goods sold or contracted to be sold * * *."

In September, 1964 that section was replaced by § 2–201 of the Uniform Commercial Code which amended, but did not change the substance of the law. The Official Comment on this amendment points up the essential requirements of the New York Statute of Frauds governing the sale of goods:

"Purposes of Changes: The changed phraseology of this section is intended to make it clear that:

1. The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. * * * The only term which must appear is the quantity term * * *. Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be 'signed', a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity."

Apart from the omission of the essential quantity term in Mrs. Allen's letter of April 15, 1964, that letter clearly does not " * * * standing alone, * * * completely [represent] an acknowledgement or admission of the party of the existence of an agreement, promise or undertaking which obligates him to pay or perform as alleged". Morris Cohon & Co. v. Russell, 29 A.D.2d 221, 225, 287 N.Y.S.2d 431, 435 (1st Dept. 1968).

The writing here involved failed sufficiently to indicate that a contract to sell or a sale had been made. Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953). It is insufficient *prima facie* to charge defendant with the obligation to be enforced, *Morris Cohon & Co.*, supra.

I resolve the questions of credibility raised by conflicting testimony in favor of the defendant and against the plaintiff on the basis of my evaluation of the oral testimony and the demeanor evidence of the respective witnesses. The defendant's case was corroborated by the records of the defendant, the values involved, the circumstances of the transaction and the reasonable probabilities. The Court does not accept as credible the plaintiff's testimony that he was not told of a "Rarity Collection" or that he failed to notice the "Rarities" labelling on the two cigar boxes housing that collection and the different identification number on the coin packets from that on the "Swiss Coin Collection" housed in boxes denominated "Switzerland". The defendant was therefore justified in believing that the plaintiff conceived the sale to refer solely to coins in the "Swiss Coin Collection" rather than all of her Swiss coins, although this might not have been the case so far as plaintiff was concerned.

The plaintiff has failed to sustain his burden of establishing by a fair preponderance of credible evidence that there was a meeting of the minds on a contract of sale. Furthermore, as to the contract claimed to have been made, no sufficient memorandum to satisfy the applicable Statute of Frauds was signed by the defendant or her authorized agent.

The complaint should be dismissed and the injunction against defendant dissolved.

So ordered.