**FLOWER CITY PAINTING CONTRACTORS, INC., Appellant,**

v.

**GUMINA CONSTRUCTION COMPANY, Appellee.**

**No. 130, Docket 78–7217.**

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1978.

Decided Jan. 9, 1979.

Sheldon M. Markel, Buffalo, N. Y., for appellant.

Paul R. Braunsdorf, Rochester, N. Y. (Harris, Beach, Wilcox, Rubin & Levey, Rochester, N. Y., of counsel), for appellee.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

GURFEIN, Circuit Judge:

This is an action for breach of contract, entertained in the District Court for the Western District of New York (Hon. Harold P. Burke, Judge) by virtue of the diversity of citizenship of the parties.[1]   28 U.S.C.

---

1. The jurisdictional basis for consideration of this suit was not discussed below. The complaint asserted federal question jurisdiction only under 28 U.S.C. § 1343 with regard to claims under 42 U.S.C. §§ 1981 and 1983 and

Title VI of the Civil Rights Act of 1964, but the District Judge's findings make it evident that there is actual diversity of citizenship as well as the requisite jurisdictional amount.

§ 1332. Plaintiff-appellant, Flower City Painting Contractors, Inc. ("Flower") is a newly formed painting contracting firm in Rochester, New York, owned and managed by black minority personnel. Defendant-appellee, Gumina Construction Company ("Gumina") is an Ohio company with its principal place of business in Lorain, Ohio.

Gumina entered into a prime contract with the FIGHT Village Housing Development Fund Company, Inc., for the construction of a garden type apartment project called "FIGHT Village," on March 12, 1973. The project was federally funded and developed under the auspices of the Federal Housing Authority of the Department of Housing and Urban Development ("HUD"). Pursuant to Executive Order No. 11246, which prohibits employment discrimination by Government contractors, HUD regulations and the terms of the prime contract required the prime contractor to undertake an affirmative action program that included efforts to recruit and hire minority subcontractors. HUD Contract Compliance Handbook 8000.6 at 27 (1972). Compliance was a condition of the contract.

Part of Gumina's affirmative action obligation was satisfied by its award of a subcontract for painting in the FIGHT Village to Flower on April 16, 1973. As indicated by the cost breakdown summary sheet attached to the prime contract, the total anticipated cost of painting and decorating the *entire* FIGHT project was to be $101,-000. This estimation of cost was significant, since an excess of cost in one aspect could have caused a cost overrun that would cut into the prime contractor's profits. The subcontract executed with Flower provided that Flower was to be paid $98,499.84 for its work, a sum that was roughly only $2500 less than the maximum allotted for painting and decorating the entire project.

The terms of the Gumina-Flower subcontract included the language of Flower's original bid on the subcontract which was incorporated *in haec verba* as Schedule A of the subcontract. That Schedule reads as follows:

"SCHEDULE A"

The painting of the above mentioned project in accordance with the painting specifications and plans for this project.

| | | | |
|---|---|---|---|
| 1. | One bedroom units | $*335.00 per unit | $*17,420.00 |
| 2. | Two bedroom units | $*371.00 per unit | $*28,196.00 |
| 3. | Three bedroom units | $*428.00 per unit | $*29,960.00 |
| 4. | Four bedroom units | $*477.58 per unit | $*22,923.84 |
| | | A Total of: | $*98,499.84 |

Please note: price given reflects no bonding requirement and a non-union job operation.

The subcontract also incorporated by reference the prime contract, drawings, addenda, and specifications, as well as modifications subsequently issued. Indeed, Schedule A made specific reference to the contract specifications and plans in defining the scope of the subcontractor's work. The subcontract further provided that the subcontractor would "faithfully observe all requirements and conditions set forth by plans and specifications on file at the F.H.A. Office in Buffalo, N.Y. . . .," and that these documents were to be "available for inspection by the Subcontractor upon his request."

On March 18, 1974, nearly one year after Flower entered into the subcontract, it asserted in a letter to Gumina that the contract required Flower to paint interior walls of the individual apartment units only and that Flower was not obligated to paint exteriors or common buildings.[2] On March 25, 1974, Flower received from Gumina a copy of Article II of the subcontract with additional explanatory language typed in as a reminder of obligations which Gumina insisted that Flower had under its subcontract. This notation stated: "It is further

The trial court did not make any specific rulings with respect to plaintiff's civil rights claims, which do not appear to have entered into the trial. On this appeal, plaintiff argues that the trial judge denied it the opportunity to present evidence on the discrimination issue. The record reveals no effort to present such a case. The contention that the trial judge was unfair is without merit. We do not consider the appropriateness of the statutory provisions the plaintiff invokes as a basis for its discrimination cause of action.

2. There is some indication that this opening salvo was preceded by discussion. *See infra.*

understood that this contract includes all exterior work, (encompasses all work, within specs and drawings) except exterior siding. The community building is also a part of this contract." On March 29, 1974, the president of Flower submitted to Gumina an itemization of additional costs for this "exterior work," claiming that it was not required to do the painting of apartment laundry rooms, storage rooms, and hallways, as well as of exterior doors, trim and certain common buildings.[3] On April 4, 1974 (the letter was erroneously dated March 4), Gumina responded to Flower's demand for extra payments by reiterating that the exterior work specified by Flower as requiring additional payment, was work which had already been agreed upon. Gumina, in the same letter, though the work had not yet begun, cancelled the contract. Appellant sued Gumina for damages.

At trial, Gumina defended its removal of Flower on the ground that the latter had misinterpreted the contract, and that by insisting upon extra payment for the painting of exteriors Flower had refused to comply with the terms of—and had thereby repudiated—the existing subcontract. Flower maintained the converse position: that Gumina had unilaterally attempted to enlarge the scope of Flower's obligation under the contract by requiring work outside the individual "unit" interiors. The trial court accepted the contract interpretation offered by Gumina. It found, despite Flower's contentions that it had been hired to paint only the walls *in* the "units," that, on the contrary, neither the subcontract nor the specifications incorporated by reference excluded common hallways, storage areas, laundry rooms, or exterior surfaces of FIGHT Village. The court determined that the specifications required the painting of " 'all surfaces except those specifically excluded.' "

The court held that Flower committed a breach of contract "by asking for extra pay for work it was obligated to do under its contract." It found that "Flower City unequivocally declared its refusal to perform according to the contract" and that "cancellation was the proper response by Gumina Construction." It was on that basis that the complaint was dismissed after trial.

On this appeal, the defendant contends that an alternative ground upon which to uphold dismissal of Flower's suit is that no subcontract was actually formed between Flower and Gumina because there was no "meeting of the minds." This issue was not expressly considered by the District Court, although the assumption that a contract existed as interpreted by Gumina is implicit in its ruling.

If we hold Flower strictly to its obligation to recognize that the specifications were part of the subcontract, then its claim for additional payment as a condition of performance was unjustified, as Judge Burke found. This, in turn, would raise the question whether a refusal to perform part of an alleged contract, except in accordance with one's own interpretation, is a repudiation. If so, we would then have to decide whether such a repudiation by Flower was sufficiently material to be treated as a justification for unilateral rescission by Gumina. Thus, if we adopted the approach of the court below that there was a contract, even aside from the issue of what were its obligations, we would have considerable difficulty in weighing the correctness of the conclusion of law that there had been a repudiation sufficient to justify an immediate unilateral rescission.

We think, however, that this thorny problem need not be reached. Rather, we have concluded—using the objective criterion of judgment—that there was no meeting of the minds in the first instance and that, hence, there never was a contract enforcible by either party.

Viewing the subcontract itself as written, both Flower's and Gumina's interpretations of the document are plausible. The description of the subject matter of the contract in

---

3. The extra work was estimated to cost an additional $14,545.17, about 15 percent of the subcontract price.

Schedule A in terms of "units" and the fact that the total bid listed is the aggregate of the bids on the individual units suggest that nothing more was required to be painted than the actual units themselves. On the other hand, the incorporation of the specifications with their delineation of exterior painting chores and the use of the word "project" in Schedule A indicate that the scope of the work encompassed all painting in FIGHT City.

Resolution of this ambiguity might be effected by construing the contract on the assumption that it incorporated the habitual or customary practice of the construction industry in Rochester, New York, that painting subcontracts be awarded on an entire project basis.

■ Such usage, if operative, may be proved by parol, as was done here. *See, e. g., Division of Triple T Service, Inc. v. Mobil Oil Corp.,* 60 Misc.2d 720, 730–31, 304 N.Y.S.2d 191 (Sup.Ct.1969). But proof of the usage is not enough by itself to establish the meaning of the contract, for "[a] party cannot be bound by usage unless he either knows or has reason to know of its existence and nature." Restatement (First) of Contracts § 247, comment b. *See Walls v. Bailey,* 49 N.Y. 464 (1872).

■ In an ordinary situation involving the painting subcontract on a construction job in Rochester, the court could find as a fact that a painting contractor "knows or has reason to know of [this usage's] existence and nature." It seems clear enough that Flower actually did *not* know the usage, as its President testified, and the court made no finding to the contrary. The question whether Flower had "reason to know" is the issue.

Flower was brought into the picture by the imposition on the contractor of an affirmative action program. While competence to do the job must have been the assumption of the Regulation, experience in the trade was not. Flower was a neophyte minority painting contractor. This was its first substantial subcontract on a construction job. It would be unrealistic to hold it strictly to a "reason to know" standard of trade usage.

■ The consequence of ruling that *Flower* cannot be held to trade usage is recognition, however, that the contract document could represent two different understandings of what the subject matter embraced. This means that *Gumina,* as well, was not bound since it takes two to make a contract. Unfortunately, there was no contract to enforce *in favor of Flower,* as there would have been no contract to enforce *against Flower* if Gumina had been the plaintiff in an action for breach. And we cannot say that either party acted so unreasonably as to justify construing the ambiguity in the contract against it. Each party, in fact, held a different and reasonable view of the undertaking, Flower on the basis of its literal reading of the word "units" and Gumina because of its suppositions concerning trade practice and its awareness that Flower was to be paid virtually the entire sum allocated to painting the FIGHT City project.[4]

Though the setting is new, the problem is old. In two nineteenth century cases, *Raffles v. Wichelhaus,* 159 Eng.Rep. 375 (Ex. 1864) (the famous *"Peerless"* case) and *Kyle v. Kavanagh,* 103 Mass. 356 (1869), courts, when faced with an arguably material contract term that could mean or represent two different things, found that no contract existed. *See* O. Holmes, *The Common Law* 309–10 (1881).[5] As Judge Pollack

---

4. We do note, however, that Flower's people expected to make a profit of about $60,000 on this $98,000 contract, which may be some indication that their view of the scope of the work was unrealistic.

5. There is an even earlier case in which the problem was considered at some length by Justice Story sitting as Circuit Justice. In *Hazard v. New England Marine Ins. Co.,* 11 Fed.Cases 934 (C.C.D.Mass.1832) (No. 6,282), the question arose as to whether the term "coppered ship" in a marine insurance contract was to be understood according to the usage in the shipowner's home port of New York or according to usage in the underwriters' city of Boston: the underwriters, defending a suit on the contract, maintained that the plaintiff had not provided a coppered ship as promised, while the

noted in *Oswald v. Allen,* 285 F.Supp. 488, 492 (S.D.N.Y.1968), *aff'd,* 417 F.2d 43 (2d Cir. 1969), the essence of the *Raffles* opinion was that "neither party had reason to know of the latent ambiguity. . . ." The rule of *Raffles* and *Kyle* was adopted and more fully formulated in the Restatement (First) of Contracts § 71(a).

> If the manifestations of intention of either party are uncertain or ambiguous, and he has no reason to know that they may bear a different meaning to the other party from that which he himself attaches to them, his manifestations are operative in the formation of a contract *only* in the event that the other party attaches to them the same meaning. [Emphasis added.]

*Accord, Oswald v. Allen, supra; Julius Kayser & Co. v. Textron, Inc.,* 228 F.2d 783, 789–90 (4th Cir. 1956); *Hayford v. Century Insurance Co.,* 106 N.H. 242, 209 A.2d 716, 718 (1965); *Wright v. Dutch,* 140 Cal. App.2d 891, 296 P.2d 34 (Cal.App.1956); Restatement (Second) of Contracts § 21A (tent. draft); 3 Corbin on Contracts § 599, at 593–97; 1 Williston on Contracts § 95, at 344–48 (3d ed. Jaeger); Young, *Equivocation in Agreements,* 64 Colum.L.Rev. 619, 621 (1964); *see Dadourian Export Corp. v. United States,* 291 F.2d 178, 187 & n. 4 (2d Cir. 1961) (Friendly, J., dissenting).

We affirm the judgment of dismissal on the ground that no enforcible contract ever came into existence.

The dissenting opinion, finding a contract as interpreted by Flower, relies upon some testimony by Ellison, president of Flower, that he was told by the superintendent for Gumina in March 1974—almost a year after the putative "contract" was signed—that there had been some "changes" since the signing and that the Gumina superintendent, therefore, had to add a "piece of contract document." The dissenting opinion finds that this bit of testimony indicated that Gumina was "redefining the scope of the work by a 'further understanding'" and concludes that "[c]learly, Gumina made an initial mistake and then tried to get Flower to change the contract." Dissent op. at 168. But we are not the trial court, and this conclusion rests upon an opinion as to the credibility of a witness whom Judge Burke heard, and whom we have never seen. If Judge Burke had believed this parol evidence, it would have amounted to an admission regarding the construction of the contract by Gumina. Although this testimony was admitted, Judge Burke found, nevertheless, that the "piece" of document Flower received from Gumina later in March was "a copy of Article II of the subcontract, with additional explanatory language as a *reminder of obligations Flower City had under its subcontract.*" Finding No. 14 [emphasis added]. One may assume, therefore, that, in reaching Finding No. 14, Judge Burke rejected Ellison's testimony to the contrary.

The judgment is affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent and would reverse the judgment.

It seems to me that we must construe the original contract against the general contractor who prepared it. To be sure, the parties based that contract on a proposal, which Flower submitted and Gumina accepted, stated precisely in the terms of the schedule attached to the contract. But Gu-

---

plaintiff argued that the ship was coppered as he understood it. At one point in Justice Story's instructions to the jury, he charged that if the plaintiff and the underwriters had differing understandings of the term "coppered" and if neither had cause to know of the other's understanding, then no contract should be deemed formed because there was mutual mistake. *Id.* at 936–37.

On appeal, the judgment for the underwriters was reversed. *Hazard's Admin. v. Marine Insurance Co.,* 33 U.S. (8 Pet.) 557 (1834). The Supreme Court reasoned that underwriters should be presumed to be aware of the usages of their clients as a matter of *their* business. The "meeting of the minds" question was not extensively considered in the reported oral argument; the participants viewed the real choice to be between accepting the shipowner's or the underwriters' interpretations and enforcing the contract one way or another.

mina had indicated to Flower that the proposal was in the form necessary to win the bid; and it was important to Gumina for purposes of the affirmative action program required under HUD regulations, majority op. at 163, that Flower obtain the painting subcontract. As the majority notes, Schedule A does refer to the "painting of the above mentioned project in accordance with the painting specifications and plans for this project"; but it also specifically itemizes the work and the price in terms of the one, two, three, and four bedroom units, stating a price per unit, then the total price for each size apartment, and finally a grand total for all units of all sizes which equals the contract price of $98,-499.84. To my mind this schedule means exactly that the painting envisioned under the contract included only the "units" themselves and that the exterior, the community building, and the interior halls were not included. Indeed there was evidence that when Flower submitted its proposal the interior halls were going to be brick and *not* painted at all.[1]

The contract itself, consisting of a standard American Institute of Architects (AIA) Subcontract of seven printed pages which the parties had completed in full by typewriting and duly executed along with a typewritten two-page rider and the "Schedule A," refers to the scope of the work as follows in Article 2, entitled "The Work":

> The Subcontractor shall furnish all labor, materials and equipment and shall perform all the Work . . . described in Schedule A attached hereto and made a part hereof as if fully set forth in this space.

> The subcontractor further agrees that it will faithfully observe all requirements and conditions set forth by plans and specifications on file at the F.H.A. Office in Buffalo, N.Y. and identified as F.H.A. Project No. 014–44028–NP–R–SUP.

Thus, it is Schedule A itself, duly quoted in the majority opinion at 163 and not repeated here, that sets forth the scope of the work. To be sure, in the second paragraph of Article 2, the subcontractor specifically agreed to observe "all requirements and conditions set forth by plans and specifications on file." But it does not seem to me that those words can be construed to cover work other than that specified in Schedule A, the incorporated description of the work under the contract. The subcontractor, Flower, promised to observe the "requirements and conditions" set forth in the plans and specifications, including the general conditions and standards and the modifications and supplements thereto as well as the requirements and conditions in the painting specifications as to quality and type of paint, method of application, and the like. I do not see, however, that any of these requirements and conditions adds to the *scope* of the painting work to be done.

The majority relies on the introductory clause in Schedule A reading, "The painting of the above mentioned project in accordance with the painting specifications and plans for this project." But the particular governs the general, and immediately below the quoted caption the schedule lists the per unit figures for the different size apartments and sets out a total price for size representing the price for the total number of units of each size. Moreover, the introductory clause in Schedule A does not say "*all* painting in the above mentioned project"; it says "the painting of the above mentioned project."

The majority suggests that had Flower examined Defendant's Exhibit 5, the prime contract with the cost breakdown for each type of labor and materials, which indicates a total painting cost of $101,000, Flower would have known that Gumina would require the painting of the exterior work, interior hallways, and the community building in addition to the units themselves for

---

**1.** Michael Ellison, president and general superintendent of Flower, testified on cross-examination as follows:

> The General Contractor informed us what had to be painted on the Fight Village

> project, because the preliminary specs were not complete. So he told me the public hallways there were going to be brick, so it was to my understanding from the General Contractor that was not going to be painted.

less than $101,000 and that given Flower's contract for $98,499.84, the contractor would go over his projection for painting costs unless Flower did all the painting. I do not think, however, that we can hold the subcontractor to this kind of knowledge simply because the prime contract was on file. A contractor can over- or underestimate a particular portion of the work, and here Flower followed Gumina's own suggestions as to price, proposal format, and scope of work.

If there were any doubt as to the meaning of the subcontract—and it seems to me there cannot be because of the undisputed evidence that the general contractor, Gumina, drew the contract and that Flower submitted the proposal precisely in the terms of Schedule A at Gumina's specific request—the subsequent conduct of the parties is quite compelling.[2] Gumina's field superintendent, Brian Smith, asked Flower's president and general superintendent, Michael Ellison, to bring a copy of the contract "over to the job site." He then "informed [Ellison] that since we had signed the contract, there had been some changes and he needed to get [Ellison's] copy of [the] contract so that he could add a piece

of contract document to [the contract]."[3] That "piece of contract document" was a new AIA subcontract page covering Articles 1–4 inclusive and redefining the scope of the work by a "further understanding," namely that all exterior work and the community building were included (at the original price).[4] Smith told Ellison "that he didn't think the exteriors or the common interior hallways were included" and that he thought that Ellison "ought to amend the contract."[5] Clearly, Gumina made an initial mistake and then tried to get Flower to change the contract. There had been a meeting of the minds on the terms of the contract as stated in Schedule A; but one party, the one in the more favorable bargaining position and the one which had drawn the contract, had made a unilateral mistake. It does not need citation of authority to suggest that this kind of mistake does not permit repudiation, rescission, or modification of the contract.

In short, I believe that Gumina entered into and breached a valid, enforceable contract with Flower and that the case should be remanded for the ascertainment of damages.[6]

2. The majority opinion says simply that nearly one year after Flower entered into the subcontract it asserted in a letter of March 18, 1974, that the contract required interior painting only. This recitation of the events omits the testimony referred to in text in this opinion immediately *infra;* it also omits the following testimony:

A. After we received the copy of the contract back from the General Contractor, it must have been about a month or so later we received a letter from the General Contractor asking us to post a performance and payment bond. And our contract bid proposal was stated, "No bond or union required."

.    .    .    .    .

Q. Did you submit a performance bond?
A. No, I didn't.
Q. Did you submit any other instruments?
A. Yes. What we did, we turned it over to our attorney, and he wrote the General Contractor a letter.
Q. Then what happened?
A. We heard nothing else from the General Contractor.
(Testimony of Michael Ellison.)

3. This was the undisputed testimony of Mr. Ellison. Gumina never called its field superintendent, Mr. Smith, to testify.

4. I note that even the addition to the contract does not mention the interior hallways.

5. As Flower was subsequently to write Gumina, on April 11, 1974 (Ex. 8):
In respond *[sic]* to your letter dated March 4, 1974, wherein you stated that we proposed additional cost for items already agreed upon in our formal contract, there must be a lack in communication between your field office and your home office. Mr. Bryant *[sic]* Smith advised our company to submit a price for the items that were not a part of our original contract. We have met three or four times to discuss these matters. Mr Bryant Smith gave us a set of plans, in order that we might apply cost to these additions.

6. I agree with the majority on the argument pertaining to custom in the trade. If the contract were really ambiguous such evidence might be admissible generally, but it would not be admissible against Flower in this case.
The trial judge made a number of findings pertaining to damages; but these do not in my

view support his conclusion, among others, that Flower "failed to establish a rational basis for its assertion of lost profit and failed to prove prospective lost profits with reasonable particularity and certainty." *Flower City Painting Contractors, Inc. v. Gumina Constr. Co.,* Civ.No.74–552, at 9 (W.D.N.Y. Feb. 16, 1978). The evidence was somewhat vague and conclusory but, with all respect, not so uncertain in my view as to require dismissal of the case.