**MARION COAL CO., Petitioner and Cross-Respondent,**

v.

**MARC RICH & CO. INTERNATIONAL, LTD., Respondent and Cross-Petitioner.**

No. 81 Civ. 5972 (LBS).

United States District Court, S. D. New York.

April 21, 1982.

Cleary, Gottlieb, Steen & Hamilton, New York City, for petitioner and cross-respondent; George Weisz, New York City, of counsel.

Milgrim Thomajan Jacobs & Lee, New York City, for respondent and cross-petitioner; David P. Langlois, New York City, of counsel.

SAND, District Judge.

This case presents the question whether Marion Coal Company ("Marion") and Marc Rich and Co. International, Ltd. ("Marc Rich") have entered into an agreement to arbitrate. On August 10, 1981, Marc Rich served Marion with a demand for arbitration arising out of a dispute over a contract for the long-term supply of steam coal, which Marc Rich alleges the parties entered into on February 11, 1981. Marion, which denies that the negotiations between the parties ever progressed to the stage of an agreement, procured a temporary stay of arbitration on August 26, 1981. Thereafter, Marc Rich removed this proceeding to this court.[1] Marc Rich petitioned for an order compelling arbitration. Both petitions are now before the Court.

The affidavits and exhibits submitted by the parties reveal the following facts and issues:

Neil Caplan, a coal commodity trader employed by Marc Rich, and Ronald Standridge, vice-president and secretary of Marion, in January 1981, entered into negotiations for the sale of coal. On January 29, 1981 Caplan sent Standridge a telex confirming a "firm offer" which Standridge had made to Caplan by telephone earlier that day. Standridge does not dispute that this telex accurately reflected the telephone conversation and, moreover, Standridge confirmed the offer by his own telex of February 2, 1981. See Standridge Affidavit of March 1, 1982 at ¶¶ 11 & 13, and Exhibit 2. The terms of this "firm offer" included material, price, quantity, shipment, delivery, and payment. Caplan Affidavit of January 8, 1982, Exhibit A. The "firm offer" also contained, under the heading "Other Conditions" the phrase "other conditions as customary." Id. The "firm offer" did not, however, explicitly mention arbitration. On February 11, 1981, five days before the expiration date of the firm offer, Caplan sent a telex to Standridge accepting the firm offer. Id., Exhibit D.

---

1. This action could originally have been brought in federal court pursuant to the grant of diversity jurisdiction, 28 U.S.C. § 1332, because Marion is an Alabama corporation and Marc Rich is a Swiss corporation with its principal place of business in Switzerland, and because the amount in controversy exceeds $10,-000.

On February 13, 1981, Caplan and Standridge met to discuss the deal, and at that time, Standridge expressed Marion's desire for a formal document which would name a subsidiary of Marion's located in the Cayman Islands as the contracting party. An exchange of proposed drafts ensued. First, on February 25, 1981, Caplan sent Standridge a draft with a covering letter which characterized it as an "accurate[ ] reflect[ion of] our negotiations and subsequent conversations" and which requested comments. *Id.*, Exhibit F. This document repeated the terms of the "firm offer," adjusted the nomenclature of parties, added a force majeure clause, and, under the heading "other conditions," stated:

> "Any controversy or claim arising out of or relating to this contract or any alleged breach thereof, shall be determined by arbitration in New York City, in accordance with the rules then obtaining of the American Arbitration Association, and judgment upon any award rendered therein may be entered in the Supreme Court of the State of New York, or in any other court of appropriate jurisdiction."

*Id.* On March 23, 1981 Standridge sent Caplan an amended version of Caplan's draft, which changed the force majeure clause and added to the payment term repeated from the original "firm offer" a requirement that Marc Rich provide Marion with an irrevocable letter of credit. *Id.*, Exhibit H. This draft retained the arbitration clause verbatim.

The relationship between the parties deteriorated shortly after a United Mine Workers strike, beginning March 27, 1981, disrupted coal production. Standridge sought to establish a new price, but Caplan considered Marion bound by the "firm offer" price. Their basic disagreement over whether a contract existed led to Marc Rich's attempt to arbitrate and the instant petitions to stay or compel arbitration.

■ The Court finds that neither petition can be granted without a trial on certain factual issues which will become clear in the following discussion. The Court will deal with the significance of a "firm offer" and the subsequent proposed drafts in sequence.

Although the parties clearly manifested agreement to the terms of the "firm offer," that offer does not specifically mention arbitration but merely states "other conditions as customary." Following the instructions of this Court, the parties submitted affidavits dealing with the customary practice in the coal industry. Marc Rich has submitted the affidavits of John Williams, an independent consultant to the coal industry, and Jean-Paul Ruff, president of Hawley Fuel Trading, Inc., both of whom state that arbitration is customary in long-term international coal supply contracts. Marion has submitted the affidavits of A. H. Woodward, III, an Alabama attorney who has negotiated long-term supply contracts between Alabama coal suppliers and international brokers, and Norman G. Wilson-Smith, president of Zinder-Neris, Inc., an American consulting company to the coal industry, both of whom state that arbitration clauses are negotiated terms that parties sometimes choose to include in such contracts. The parties' subsequent inclusion of an arbitration clause under the heading "other conditions" and the absence of any discussion of that term may tend to support Marc Rich's contention that such a term is customary. Nevertheless, Marion's affidavits establish a material issue of fact.

■ Marion argues that even if arbitration is customary, Marion cannot be bound because it was not aware of the custom. It cites in support of this view the case of *Flower City Painting Contractors, Inc., v. Gumina Construction Company,* 591 F.2d 162 (2d Cir. 1979), a case in which "a neophyte minority contractor [handling] . . . its first substantial subcontract in a construction job" was not held to the trade meaning of a term ("units") because it was found, after a trial on the merits, not to have had "reason to know" of that trade meaning. *Id.* at 165 (citing Restatement (First) of Contracts, § 247, comment b ("[a] party cannot be bound by usage unless he either knows or has reason to know of its existence and nature.")) Marion submits affida-

vits asserting that Marion had never negotiated a long-term international coal supply contract and that Mr. Standridge was thus a "neophyte." This argument fails, however, because in this case, unlike *Flower City*, the Uniform Commercial Code governs the transaction between the parties.[2] Under U.C.C. § 1–205(3), "any usage of trade in the vocation or trade in which they are engaged *or* of which they are or should be aware gives particular meaning to and supplements or qualifies the terms of an agreement." (Emphasis added). The use of the disjunctive "or" here precludes Marion from asserting its lack of knowledge with respect to a usage in a trade "in which they are engaged." Since Marion does not deny that it is engaged in the applicable trade, the Court will not submit to the jury the issue whether Marion was or should have been aware of the customary conditions, but only the issue whether arbitration was in fact such a customary condition.

■ There is a second and independent reason why *Flower City* is inapplicable to the facts present here. In that case, the question presented was whether to use a trade meaning to define a common word used in the parties' writing. There, the "neophyte" painting contractor was found not to have had reason to know that the term "units," as used in the painting trade, included the outside as well as the inside of a structure. But here, the term that appears in the writing is "other conditions as customary." It is manifestly unsound to argue that the term "customary conditions" should be defined without reference to those conditions. In *Flower* the contractor may have believed that he in fact under-

stood the meaning of the term "units" so that his actions were reasonable and in good faith in making no further inquiry with respect to that term. Here, the term "other conditions as customary" by its very nature placed Marion on notice that further inquiry on its part was required if it believed itself to be inadequately informed with respect to customs in the trade. Marion argues that because "the subject of arbitration never entered [Standridge's] mind during the negotiations, there was no 'meeting of the minds' on that language and thus no agreement as to 'other conditions.'" Marion Memorandum of Law at p. 21. The Court rejects this argument as an attempt to expand the limited doctrine of mutual mistake to subvert objective interpretation of contracts.[3]

■■ The Court must next consider the effect of the exchange of proposed drafts of a formal written agreement. Marc Rich argues that the arbitration clause in these drafts became part of the agreement which it contends the parties entered into on February 11. Marion argues that insofar as the parties never intended to be bound until the completion of a formal document, the proposed drafts had no legal effect.

The question presented by the exchange of proposed drafts is whether the parties intended that they would not be bound by any of the new terms until the formal document was signed or whether they were agreeing to terms as they progressed through their negotiations and viewed the formal document as a mere "memorial" of their agreement. See Corbin on Contracts, § 30. This question is one of fact. *Id.*

**2.** Both parties concede the applicability of the U.C.C. Although Marion raises some question whether Alabama or New York law governs this transaction, it notes that the U.C.C. provisions of both states are the same and that the court need not look beyond the New York statute.

**3.** Marc Rich aptly cites the following statement by Judge Learned Hand:

"A contract has, strictly speaking, nothing to do with the personal, or individual intent, of the parties. A contract is an obligation attached by the mere force of law to certain

acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there was some mutual mistake or something else of the sort."

*Hotchkiss v. National City Bank of New York*, 200 F. 287 (S.D.N.Y.1911), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913).

Since the affidavits of the parties conflict on this issue, it cannot be resolved without a trial. Therefore, Marion's argument, that the parties did not intend to be bound until the signing of the formal document, is reserved for trial. Marion's contention that the parties understood that there could be no agreement until the parties agreed upon a letter of credit is one factor which may be considered in this regard.[4]

Marc Rich argues that Marion's repetition of the arbitration clause in its proposed draft resulted in agreement to that term. In support of this view Marc Rich cites U.C.C. Section 2–207(1) which provides:

"A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."

We cannot find that Marion's written draft alone was a "definite ... expression of acceptance." Testimony at trial may establish that the parties agreed to the clause at the time of the exchange of proposed drafts, but the record currently before the Court does not require such a finding.

■ Finally, the Court must consider Marion's contention that there is no writing supporting the alleged agreement to arbitrate, as required by 9 U.S.C. § 4.

Clearly, if the trier of fact finds that an agreement to arbitrate arose during the exchange of proposed drafts, those drafts provide the needed writing. But even if the trier of fact finds that the parties reached agreement at the time of the acceptance of the "firm offer" those telexes containing the offer and its acceptance would suffice. If the express term "customary conditions" is objectively interpreted to mean arbitration, the telexes containing the term "customary conditions" would provide the needed writing.[5]

In summary, the Court finds the making of the arbitration agreement to be in issue, and, pursuant to 9 U.S.C. § 4 will "proceed summarily" to trial on this issue. For the direction of the parties the Court notes that the questions presented for trial are as follows: 1) is an agreement to arbitrate a customary condition in the trade engaged in by the parties?; and 2) did the parties agree to the arbitration term contained in the proposed draft?

A trial is hereby scheduled for April 26, 1982. As requested by Marion the trial will be by jury.

So ordered.

---

4. The Court will not, however, consider the possibility that a letter of credit was required by the parties with respect to the alleged agreement to arbitrate reached on February 11, when the "firm offer" was accepted. Although Marion argues now that it always considered a letter of credit a prerequisite to any agreement, the "firm offer" provides for payment in cash against the presentation of documents. If the trier of facts should find that the term "customary conditions" in the "firm offer" included an agreement to arbitrate, the provision for payment contained in that writing would preclude the admission of parol evidence to vary that provision. Marion attempts to avoid the parol evidence rule by characterizing the requirement as a condition precedent to the legal effectiveness of a contract. However, it is well established that parol evidence of a purported condition precedent is inadmissible if it contradicts an express term of the written agreement. *See, e.g., Bank of Suffolk County v. Kite*, 49 N.Y.2d 827, 427 N.Y.S.2d 782, 404 N.E.2d 1323 (1980); *Hicks v. Bush*, 10 N.Y.2d 488, 225 N.Y. S.2d 34, 180 N.E.2d 425 (1962).

Moreover, the Court rejects the contention that failure to include a letter of credit term defeats the formation of a contract on February 11. Under U.C.C. § 2–204(3) failure to include a term only causes a contract to fail for indefiniteness if it deprives the Court of "a reasonably certain basis for giving an appropriate remedy." Such is not the case here. Thus, evidence concerning the requirement of a letter of credit must be confined to the question of the effect of the proposed drafts which were exchanged after the February 11 acceptance.

5. This finding would not authorize the implication of an agreement to arbitrate merely from trade custom and usage, as argued by Marion. The alleged agreement to follow custom, express and not implied in this case, and the finding that custom includes arbitration, would render the agreement to arbitrate an express agreement.