UNITED STATES NAVAL
INSTITUTE, Plaintiff,

v.

CHARTER COMMUNICATIONS, INC.,
and Berkley Publishing Group,
Defendants.

No. 85 Civ. 6715 (PNL).

United States District Court,
S.D. New York.

June 9, 1988.

Abeles Clark and Osterberg, New York City (Robert C. Osterberg, of counsel), for plaintiff.

Satterlee & Stephens, New York City (Robert M. Callagy, Mark A. Fowler, of counsel), for defendants.

LEVAL, District Judge.

This is an action alleging breach of contract and copyright infringement arising from the paperback reprint publication of the best-selling novel, *The Hunt for the Red October* by Thomas L. Clancy. The plaintiff, United States Naval Institute, published the hardcover edition in October 1984 and licensed the defendant[1] to "publish the ... Work in a paperback edition not sooner than October 1985." Plaintiff contends this term of the license was violated when defendant shipped the book to booksellers prior to October 1985. It contends furthermore that pre-October sales were unauthorized by the license and therefore constituted infringements of the plaintiff's copyright. Defendant does not dispute that it shipped the book to domestic outlets before October. It contends, however, that pre-October shipment is contemplated in the industry by the term "October publication" and that its actions were entirely consistent with the rights conferred to it under the license agreement.

Trial was conducted before the court without a jury. I find the defendant has proved its case beyond dispute. There is no basis for plaintiff's contentions. The action is dismissed.

\* \* \*

United States Naval Institute is a small specialized publisher whose list is limited to books of naval interest. Before *Red October*, it had no experience in the publication of best sellers.

As assignee of the author's copyright, plaintiff planned to publish the hardcover edition in October 1984 and to license a paperback reprint edition. Plaintiff showed the manuscript to a number of paperback publishers and received a bid from defendant. Plaintiff then decided it would conduct an auction using the defendant's bid as a "floor" and granting defendant the right to top the auction's highest bid by ten percent. Plaintiff had never before conducted an auction of paperback rights and was unfamiliar with industry practices, customs and procedures. It sought advice from various knowledgeable people in the publishing industry as to how such auctions were conducted. It distributed a packet of materials to invited bidders, including a notice which set forth the terms of the auction. The materials made no mention of the date on which publication of the paperback edition would be permitted. There was no need to specify this date because, according to the conventions and business practices of the publishing industry, the paperback publication right would begin one year after the month of the hardcover publication.

Bids were received by telephone on the date specified. At the conclusion, Berkley exercised its option to top the highest bid by ten percent. Berkley then prepared the license agreement on its own form, as is the industry practice, and sent it to plaintiff. Berkley filled in the blank on the printed form pertaining to the date of hardcover publication as "October 1984" and filled in "October 1985" as the earliest permitted paperback publication date. This was in accordance with industry practice

---

and the understanding on which its bid was predicated. The parties negotiated a few minor changes, including an obligation on the licensee to print the book in its entirety. The license was executed on September 14, 1984.

Plaintiff published its hardcover edition in October as anticipated. Shortly after its appearance, it became a leading best seller and continued on the best-seller lists throughout the event in dispute.

Berkley, which publishes hundreds of paperback titles each year, included *Red October* in its October 1985 catalogue list and proceeded with its plans and preparations for October publication in a manner consistent with its regular practices and with the practices and understandings of the industry. For *Red October*, as with its other October publication titles, it scheduled the various production tasks leading up to what is referred to in the industry as the "pub date." Solicitation of orders and to-the-trade advertising was to begin in April 1985, printing in early August, and shipping to domestic outlets in early September.

When plaintiff learned in August of defendant's plans to ship, it protested. Plaintiff was concerned that the appearance of the paperback in book outlets would cut into hardcover sales. Plaintiff asserted that the license forbade pre-October shipment; it demanded that the defendant delay shipment to October. The defendant responded that its shipment plans were customary for October publication. Plaintiff sought a preliminary injunction which this court denied.

Defendant proved conclusively at trial (without any contrary evidence being offered) that "publication date" is uniformly understood in the industry to refer to the time when the concentrated selling effort begins, and not the time of shipment to outlets. The "publication date" refers usually to a month and presupposes that nationwide distribution has already been accomplished by the start of that month.

Industry leaders representing both hardcover and paperback establishments testified to the industry's understanding and practice that books are shipped three to six weeks prior to the start of the month of "publication."[2] This interval between shipping and publication is necessary to insure that the distribution process has been accomplished nationwide before the concentrated selling effort begins on the "pub date."

The process of nationwide distribution is complex and uses different channels. Some of the channels are simple and relatively quick, consuming only a few days. Others (generally involving larger volumes of books) are complicated and slow, relying on warehouses, break-up agents, wholesalers and truckers, none of whom are under the publisher's control. Cost control is an important factor. Shipment through these channels to more distant points often consumes substantially more than a minimum of two weeks. Publishers generally attempt to follow a distribution plan that ships first by the more time consuming routes to more distant points and later by the quicker routes. An effort is made in this fashion to schedule shipment so as to avoid wide disparities in the time the book goes on sale in different parts of the country. The principal objective is to be sure that, by the start of the month of publication when the concentrated selling effort begins, the book has reached and is offered by retail outlets throughout the country.

The shipping dates of the Berkley group in relation to its publication dates were entirely consistent with the practices of the publishing industry. Its scheduled dates varied as between its different imprint labels primarily to allow for access to the printer's press schedules and to permit aggregation of titles so as to qualify by bulk for minimum freight rates. Titles under the Berkley imprint were shipped on the 8th day of the month preceding the month of "publication" (or nearest working day), Jove titles were shipped on the 30th

---

**2.** The variation between three and six weeks is attributable largely to the fact that printing facilities are in limited supply.

of the second preceding month, and Ace titles on the 20th of the second preceding month, with press runs beginning in each case 30 days prior to shipment date. This schedule was in conformity with the industry practice of shipping between 3 to 6 weeks prior to the month of publication.

Berkley began shipment of *Red October* to domestic outlets on September 3 and 4. Because this was a huge shipment (approximately 1.3 million copies) of a certain best seller, Berkley shipped it separately from its other October titles. In order to economize on freight rates, a month's various titles are generally packed together for shipment. When the shipment volume for a single title is sufficiently large, the lower rates can be achieved without group packing. The title is likely to benefit from more efficient and prompt handling on reaching the bookstore if the boxes are exclusively devoted to a single best-selling title, as compared with boxes containing numerous different titles that need to be separated. Although the book was designated for "special" treatment in the sense that it was shipped alone, beginning September 3, rather than in combined shipments on September 8, this treatment was entirely consistent with "October publication." This was "special handling" in the sense that *Red October* was separated from the shipment of the other October titles, but such handling was conventional for leading titles shipped in large volume.

Because the hardcover edition had an unusually long best-selling run and was still high on the best-seller lists in September 1985, the paperback was shipped into extraordinarily favorable market conditions and achieved best-seller status before nationwide distribution had been completed. This is illustrated by the reports made weekly by the leading bookselling chains to the publishers. For the week ending September 20, the Waldenbook and B. Dalton chains reported to Berkley that *Red October* was their second and third largest volume paperback seller respectively, based on the aggregate sales of 836 Walden stores and 679 B. Dalton stores. (There is no evidence how early in the week the shipments reached their various stores.)

During the following week the book reached an additional 57 Walden stores and 48 Dalton stores; and sales increased substantially.

\* \* \*

Plaintiff contends that the contractual language authorizing the defendant to publish "not sooner than October 1985" implicitly prohibited defendant from shipping before October. Plaintiff contends that the meaning of the contract is so clear and unambiguous that the court should not have received evidence of industry custom. Plaintiff relies on authority to the effect that industry custom may not be received to contradict explicit contractual obligations. *See Croce v. Kurnit*, 737 F.2d 229 (2d Cir.1984); *Kologel Co. v. Down in the Village, Inc.*, 539 F.Supp. 727 (S.D.N.Y. 1982); *American Export Isbrandtsen Lines, Inc. v. United States*, 390 F.Supp. 63 (S.D.N.Y.1975).

■ Those authorities have no bearing on the problem. The evidence was received not to contradict an explicit contract but to help interpret an ambiguous one. Without the help of industry understandings, the meaning of this contract would be unclear. A prohibition on "publishing" sooner than October might mean many different things. It might be understood on its face to bar a publisher from taking any steps that are part of the "publication" process prior to October, including printing and advertising to the trade; it might imply the technical copyright sense of "publish," thus prohibiting any public revelation of the content before October. (Under such an understanding, any act that would constitute an infringement if done by an unlicensed interloper would be similarly unauthorized if done by the licensee before the first permitted publication date.) It might be understood to bar any shipment prior to October, or it might permit pre-October shipments only if done in a manner to preclude pre-October retail selling. At another extreme, it might have no bearing whatever on date of shipment since what is limited by contract is not "shipment" but "publication." In fact, one cannot understand the relation-

ship between the contractual term "publication" and the fact of shipping without some understanding of how the industry functions. A judge or jury called upon to interpret this contract without the benefit of evidence of industry understanding of the terminology would be engaging in guesswork. Defendant's evidence showed beyond dispute that the contractual term is used in the industry with a clearly understood meaning, that the understood meaning is regularly observed, and that defendant's conduct was wholly consistent with that understanding. When understood in the light of industry terminology, the license did not forbid shipment prior to October; it provided for October publication, which called for shipment three to six weeks earlier.[3]

██ It is the law in New York that evidence of trade usage may be used to "give particular meaning to and supplement or qualify terms of an agreement." N.Y.U.C.C. § 1–205(3) (McKinney's 1964); *see Tannenbaum v. Zeller*, 552 F.2d 402, 414 (2d Cir.), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 843–44 (2d Cir.1975); *New Hampshire Insurance Co. v. Cruise Shops, Inc.*, 67 Misc.2d 60, 323 N.Y.S.2d 352 (Sup.Ct.N.Y. Cty.1971). Evidence of trade usage is admissible to explain or supplement a contractual term. *See Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 264 (2d Cir.1987) (trade usage used to explain phrase "adverse market conditions" in firm commitment underwriting agreement); *Seven Star Shoe Co. v. Strictly Goodies, Inc.*, 657 F.Supp. 917, 921 (S.D.N.Y.1987) (trade usage admissible on meaning of term sales "representative"); *East Europe Domestic International Sales Corp. v. Island Creek Coal Sales Co.*, 572 F.Supp. 702, 708–09 (S.D.N.Y. 1983) (evidence of course of dealing admissible on issue whether "metric tons of coal"

in contract meant dry coking coal); *Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.*, 555 F.Supp. 271, 277 (S.D. N.Y.1983) (trade usage admissible to read "best efforts" clause in franchise agreement to require exclusive efforts of distributor). In *Trans World Metals Inc. v. Southwire Co.*, 769 F.2d 902 (2d Cir.1985), for example, the court considered whether a manufacturer of aluminum had breached its agreement to ship 1,000 metric tons of aluminum per month to the defendant by shipping one-fourth of that amount in the following month. The Court held evidence of trade usage properly admissible on the issue whether some part of each month's shipment could be delivered in the following month.

Similarly, in *Edison v. Viva International, Ltd.*, 70 A.D.2d 379, 421 N.Y.S.2d 203 (1st Dept.1979), where an author brought a breach of contract action against his publisher for materially altering his article, the court denied the defendant's motion to dismiss premised on the defendant's contractual "right to edit or otherwise change the Work." The Court held that "a contract must be construed according to the custom and usage prevailing in a particular trade," and that evidence of the meaning of the words "edit" and "change" should be ascertained from their usage in the publishing industry to determine whether the editor had exceeded its contractual right. *Id.* 421 N.Y.S.2d at 205.

██ Naval Institute contends it should not be bound by publishing industry practices of which it was unaware. A party is bound by trade usage if it knows *or has reason to know* of the usage. *See Flower City Painting Contractors, Inc. v. Gumina Constr. Co.*, 591 F.2d 162, 165 (2d Cir. 1979). Where a party is engaged in a particular trade, it is presumed to have knowledge of the trade usages in that trade. *See* N.Y.U.C.C. § 1–205(3) (McKinney's 1964); *Marion Coal Co. v. Marc*

**3.** Plaintiff argues that this reading is inconsistent with defendant's interpretation of the term "publication" as used elsewhere in the contract in the provisions calling for royalty payments on, and six months after "publication," which defendant observed by paying on, and six

months after October 1. Plaintiff is mistaken. There is no inconsistency. In each case, defendant and the court construe the contractual term "publish" to refer to the "pub date" of October 1, not to the earlier date of shipment.

*Rich & Co. International, Ltd.*, 539 F.Supp. 903 (S.D.N.Y.1982); *Du Pont de Nemours International S.A. v. S.S. Mormacvega*, 367 F.Supp. 793, 797 (S.D.N.Y. 1972) ("Trade usages sanctioned by the passage of time, are presumed to be within the knowledge of parties regularly engaged in the business"), *aff'd*, 493 F.2d 97 (2d Cir.1974).

 Thus, whether plaintiff did or did not in fact know of the industry practice is irrelevant. It engaged in business in the publishing industry and entered into contracts with other publishers utilizing the conventional terminology of the industry. If Naval Institute was ignorant of publishing terminology and custom, Berkley had no way of knowing it. Plaintiff had engaged in the business of publishing for nearly a century and had previously contracted with Berkley and other houses for paperback licenses. It conducted an auction according to the conventions of the industry (notwithstanding the fact undisclosed to bidders that it needed outside advice as to how such auctions are conducted). Berkley had the right to assume that this conventional everyday contractual reprint license would have the same meaning that it holds for all other participants in the publishing industry. Plaintiff cannot obtain special interpretations of its contracts by afterwards claiming it was unaware of the meaning of industry terminology.

Nor is plaintiff helped by its citation of *Bouton v. The World Publishing Co.*, Index No. 19705/1970 (Sup.Ct.N.Y.Cty. Dec. 11, 1980). There the licensee planned to *publish* three and one half months prior to the publication date permitted by its license. This was enjoined. The case has no bearing on whether publication envisages prior shipment.[4]

I find that plaintiff has failed to prove its contentions. The defendant has convincingly shown that it acted in accordance with its contractual entitlement. There was no breach of contract and no infringement of copyright. The action is dismissed.

SO ORDERED.

---

4. Nor is plaintiff's case advanced by the fact that defendant shipped 27,000 copies of the international edition by ocean freight on August 16 and 50,000 copies of the Canadian edition on August 23. International editions are shipped by sea to countries not subject to an exclusive license where they compete with the editions of British publishers. International editions are shipped as a matter of course well in advance of the domestic edition because they require two months in transit. There was little evidence about the Canadian shipment, which in any event was made within six weeks prior to the month of publication and would therefore not have violated industry standards even if it had been a domestic shipment. Finally, there is no evidence that either the Canadian or international shipment were sold at retail prior to October 1 or that plaintiff suffered any injury because of them.