[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM RE: MOTION TO SET ASIDE THE VERDICT[1]
On December 15, 1994, the plaintiff, Mohawk Mountain Ski Area, Inc. recovered a verdict of $650,000.00 together with interest from October 3, 1989 at the rate of 10%. The plaintiffs' claim was based upon an insurance policy issued by the defendant for damages sustained by Mohawk on July 10, 1989 arising out of a CT Page 574 severe weather storm. The defendant claimed that there was only one occurrence while the plaintiff offered evidence of two occurrences separated by time between four and five p. m. on that date.
As part of its verdict, the jury returned answers to interrogatories submitted by the Court as follows:
 1. How many occurrences, as that term has been defined, do you find resulted in damage to plaintiff Mohawk on July 10, 1989?
One Two X
 2. Do you find that each occurrence resulted in damages of $650,000.00 or more?
Yes X No
 3. Do you find that the plaintiff Mohawk is entitled to recover interest on the damages which you find to have been caused by a second occurrence?
Yes X No
The defendant has filed a motion to set aside the verdict with a laundry list of claims upon the following grounds:
 1. The trial court erred in denying the defendant's motion for directed verdict because, as a matter of law, the damage to Mohawk Mountain Ski Area was the result of continuous and repeated exposure to a single occurrence.
 2a. The trial court erred in excluding large portions of the deposition of Dr. Tetsuya Theodore Fujita, including his opinions regarding the number of tornadoes, was improper because the parties agreed that `any objections as to the form or for any other basis must be raised [at the deposition] or waived at the time of trial' thereby prejudicing the defendant. CT Page 575
 2b. The trial court erred in excluding large portions of the deposition of Dr. Tetsuya Theodore Fujita, including his opinions regarding the number of tornadoes, was improper because Practice Book § (3)(c)(1-2) provides: `Objections to the competency of a witness or the competency, relevancy or materiality of testimony are . . . waived by failure to make them before or during the taking of the deposition [if] the ground of the objection is one which might have been obviated or removed if presented at that time. Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of parties, and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.' and the objected to portions, if objected to seasonably at the deposition, would have been obviated, removed or cured.
 3a. The trial court erred in excluding Jack Ellen from being able to testify as an expert in the field of Insurance to the definition of `risk' as that term is stated in the policy by improperly leaving the interpretation of the policy to the jury and prevented the defendant from presenting a proper defense.
 3b. The trial court erred in excluding Dallas Dodge and Richard McKenna from being able to testify as experts in the field of Insurance to industry treatment of an all-risk policy and to the fact that the storm is considered one occurrence under the policy by improperly leaving the interpretation of the policy to the jury and prevented the defendant form presenting a proper defense.
 4. The trial court erred in excluding the `Storm Data Report' from being introduced as a full exhibit as an official publication under the Connecticut Rules of Evidence when the exhibit was a certified copy, certified by the Federal CT Page 576 Government, and relied on by William Haggard, an expert in the field of meteorology, for information not contained in any other material thereby prejudicing the defendant.
 5. The trial court erred in allowing the plaintiff to introduce evidence of borrowing money to repair its property when such evidence was irrelevant to the issues in the case thereby prejudicing the defendant.
 6. The trial court erred in charging the jury that the terms of the policy can be interpreted most favorably to the insured if the jury finds the contract ambiguous thereby prejudicing the defendant because it is the obligation of the Court to determine whether the policy was ambiguous and should not be left to the jury. Further, no such determination was made or necessary as the policy was silent on certain terms not ambiguous.
 7. The trial court erred in charging the jury on occurrence thereby prejudicing the defendant because the Court did not correctly and accurately state the law of occurrence with regard to the circumstances at issue in that Newmont Mines Ltd. v. Hanover Insurance Co., 784 F.2d 127 (2d Cir. 1986) does not apply to this case and that the charge should have been in accordance with the defendant's request to charge number 12.
 8. The trial court erred by referring to Plaintiff's exhibits 16, 17, 20, 21 with regard to the jury's determination of damages thereby prejudicing the jury in favor of the plaintiff by tending to dissuade them from looking at other methods of computing damage.
 9. The trial court erred by failing to give a charge on `risk' pursuant to defendant's Supplemental Request to Charge #17 thereby prejudicing the defendant.
 10. The trial court erred by failing to give a charge on `loss' pursuant to defendant's Request to CT Page 577 Charge dated December 6, 1994 thereby prejudicing the defendant.
 11. The trial court erred by failing to give defendant's Request to Charge dated December 6, 1994 on the plaintiff's knowledge and understanding of the policy of Insurance thereby prejudicing the defendant.
 12. The trial court erred by failing to give defendant's Request to Charge dated December 6, 1994 on `source of damages' thereby prejudicing the defendant.
 13. The trial court erred by failing to give additional interrogatories, as contained in the Defendant's Proposed Interrogatories dated December 6, 1994, specifically #1, 2, and 4 on the number of storms and tornadoes, as such interrogatories are necessary for appeal and therefore prejudiced the defendant.
Both parties agree that the insurance policy issued by American Home to Mohawk as a $650,000.00 per occurrence policy; and that the insurance policy contained no definition of "occurrence". The policy contained no generic definition of occurrence nor did it specify what events constituted an occurrence except with respect to the perils of earthquake and flood.
The plaintiff contended that two tornadoes struck Mohawk on July 10, 1989; that the two tornadoes were separated in time, each striking distinct separate areas of plaintiff's property and that "but for" each tornado, the damage attributable to each would not have occurred. Defendant argued that either no tornado or one tornado struck Mohawk; and further that, irrespective of how many tornadoes may have struck Mohawk, the damage incurred was the result of one storm and thus was one occurrence.
The matter that was submitted to the jury was a determination of the number of occurrences that had caused loss to Mohawk on July 10, 1989. Contrary to defendant's assertion, the jury was not instructed to determine the number of tornadoes striking Mohawk, nor CT Page 578 was it instructed to disregard the number of storms.
Based on the court's instruction to the jury, it was to find how many separate events caused damage; the jury could have found that the "occurrence" or "occurrences" in question were storms, storm cells or tornadoes. The jury was instructed that if the "damage incurred was a single continuous event or incident" then the loss constituted a single "occurrence." If, on the other hand, the damage constituted two separate events occurring unexpectedly then they could find that there were two "occurrences." In determining the separability of the events the court charged that the jury could consider separation in time and space and whether damage to one structure caused or contributed to damage to another structure. Based on the evidence, the jury concluded that two "occurrences" had caused damage to Mohawk on July 10, 1989.
 In passing upon a motion to set aside a verdict, a trial court must view the evidence offered at `trial' in the light most favorable to sustaining the verdict.' Wochek v. Foley, 193 Conn. 582, 587
(1984); accord, Geryk v. Atlantic Richfield Co., 19 Conn. App. 585, 586-87 (1989); Shenefield v. Greenwich Hospital Ass'n, 10 Conn. App. 239, 247
(1987).
The trial court's discretion is limited when considering setting aside a jury verdict. The basic principle is that the trial court must not usurp the fact-finding function of the jury. The trial court is thus limited to determining whether there is any evidence to support the verdict. Lemonious v. Burns,23 Conn. App. 735 (1991) cert. denied 218 Conn. 903, app. afterremand, 27 Conn. App. 734, cert. denied 223 Conn. 915. See also Klingeman v. MacKay, 25 Conn. App. 217, cert.denied 220 Conn. 910 (1991); Martin v. Samulis,24 Conn. App. 85 (1991); American Nat. Fire Ins. Co. v. Schuss,221 Conn. 768 (1992); Capiopoli v. Acampora, 30 Conn. App. 327 (1993).
A judgment in accordance with an earlier motion for a directed verdict, i.e., a judgment non obstante verdicto (n.o.v.), may be rendered whether application of legal principles to proven facts demonstrates that a CT Page 579 party against whom verdict was found is entitled to judgment.
Thus, the court should enter judgment n.o.v. if evidence establishes, as a matter of law, that party who had obtained verdict could not, and was not entitled to prevail. Gesualdi v. Connecticut Co., 131 Conn. 622, 627
(1945).
In considering the motion, the evidence must be accorded the most favorable construction in support of the verdict as is reasonably possible. Aksomitas v.Aksomitas, 205 Conn. 93, 100 (1987); Bogart v. Tucker,164 Conn. 277, 284 (1973).
 I. The damage to Mohawk was not a single occurrence as a matter of law.
The defendant's argument that the damage to Mohawk is a single occurrence as a matter of law is unfounded in law. The policy itself does not define occurrence; nor does the policy state that the risk insured against is "storm" rather than "tornado".[2] Although the policy could have provided that events occurring within a particular time duration constituted one occurrence or could have established an aggregate dollar maximum for a particular peril, as the policy did with earthquakes and floods, defendant did not do so in this policy.[3]
What is clear is that there is no definition of "occurrence" as a mater of law. Defendant's assertion that two tornadoes striking at separate times within a 45 minute period, at separate, distinguishable locations produced by two storm cells cannot, as a matter of law, constitute two occurrences is ludicrous, defies logic, and is contracted by the treatises and case law. American Home's argument that it would be inequitable to interpret "occurrence" as a multiple event is particularly disingenuous. American Home could easily write into its policies a definition of "occurrence". American Home, if it chooses, can easily escape its own "inequity" argument by defining its policy terms. CT Page 580
 II
The defendant claims harmful error in the exclusion of portions of the deposition of Dr. Tetsuya Theodore Fujita (Defendant's motion #2a-2b); in excluding the testimony of Jack Ellen (Defendant's motion, #3b); in excluding the "Storm Data Report" (Defendant's motion, #4); and in permitting evidence of plaintiff's borrowing money to repair its property (Defendant's motion #5).
A ruling on the evidence must be both wrong and harmful in order to entitle an aggrieved party to a new trial. Decarufel v. Colonial Trust Company, 143 Conn. 18
(1956). Moreover, "the trial court has broad discretion to determine the admissibility of evidence and its rulings will not be disturbed on appeal absent an abuse of that discretion." Konover Development Corp. v.Zeller, 228 Conn. 206, 232 (1994); Hall v. Burns,213 Conn. 446, 451 (1990). As discussed below, none of these evidentiary rulings constituted harmful error.
 2a. The parties did not agree that all objections to Dr. Fujita's testimony had to be raised at the deposition.
Defendant argues that the trial court erred in excluding portions of Dr. Fujita's deposition because the parties had agreed that "any objections as to the form or for any other basis must be raised [at the deposition] or waived at the time of trial." (Defendant's Motion #2a.) Defendant's assertion concerning what the parties agreed to is, however, not true.
Contrary to defendant's assertion, counsel for plaintiff clearly did not agree that all objections concerning Dr. Fujita's testimony had to be raised at the deposition. It is true that defendant's counsel appeared to attempt to obtain such an agreement, stating:
 First of all, the deposition is being taken according to the Connecticut Rules of Civil Procedure, pursuant to the Connecticut Practice Book, and then some basic stipulations. I think we can agree on this. . . . CT Page 581
 Further, any objections as to the form or for any other basis must be raised today or waived at the time of trial.
Fujita's Dep., p. 4.
At the end of his remarks, defendant's counsel invited a response from plaintiff's counsel:
 I have nothing else, I don't know if you have anything, Charles
Rather than agree to the stipulations defendant's counsel had proposed, plaintiff's counsel clearly stated that use of the deposition would be governed by the rules of practice and be only useable to the extent permitted by the rules of evidence. Specifically, plaintiff's counsel stated:
 With respect to the use of the deposition, those will be governed not only by the rules of practice but will be useable to the extent permitted by the rules of evidence.
Fujita's Dep., p. 5.
Indeed, plaintiff's counsel reiterated his understanding that the use of the deposition would be governed by Practice Book § 248: "And with respect to the use of the deposition, that will be governed by Connecticut Practice Book § 248."
Section 248(2) of the Practice Book provides:
 Subject to the provisions of paragraphs (3)(c) of this section, objections may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness was then present and testifying. (Emphasis added).
Thus, the position of plaintiff's counsel concerning the rule (Practice Book § 248) which would apply to use of the deposition at trial was clear. Had defendant's counsel intended to secure an agreement or stipulation CT Page 582 that plaintiff's counsel would waive objections not required by Practice Book § 248 to be made at the deposition he had ample opportunity to secure such an agreement. The record reflects no such agreement.
 2b. This Court did not err in excluding portions of Dr. Fujita's testimony.
The defendant argues that this court erred in excluding portions of Dr. Fujita's deposition testimony because plaintiff waived its objection to such testimony by not making objections at the deposition, citing Practice Book § 248(3)(c)(1-2). The defendant's argument is incorrect because: (1) the evidence was properly excluded pursuant to the rules of evidence; and (2) plaintiff's counsel made clear at the deposition his objections to the nonresponsive nature of Dr. Fujita's answers, but counsel for defendant ignored these objections and permitted Dr. Fujita to make speeches unresponsive to any question.
It should first be noted that by deleting words in Practice Book § 248(3)(c) and by inserting words not in that section, defendant's counsel has misstated the rule. Unlike the edited language defendant's counsel represents in defendant's motion (Defendant's motion #2b.), § 248(c)(c) does not set forth a general rule whereby objections are waived. Rather, § 248(3)(c) provides generally that "[o]bjections to the competency of a witness or to the competency, relevancy or materiality of testimony are not waived by failure to make them before or during the taking of a deposition" unless the narrow set of circumstances set forth in § 248(3)(c) are met.
The only objections waived pursuant to § 248(3)(c) are those which could have been obviated or removed if made at the deposition. To the extent that Dr. Fujita's testimony was ruled inadmissible because evidence necessary to support his opinion was not in evidence, thereby depriving his opinion of a foundation, the defendant had the opportunity at trial to present evidence sufficient to provide an adequate foundation for Dr. Fujita's testimony. That defendants failed to do so was not because plaintiff's counsel did not make an objection at Dr. Fujita's deposition. Rather, it was CT Page 583 because defendant did not have or chose not to offer admissible evidence at trial to supply the necessary foundation for Dr. Fujita's testimony.
As Professor Tait points out:
 Before a hypothetical question can be asked or an expert opinion ventured on direct examination, the facts on which it is based must be in evidence Graybill v. Plant, 138 Conn. 397, 403, 84 A.2d 238 (1951). On direct examination the question must contain only facts fairly within the evidence. Johnson v. Toscano, 144 Conn. 582, 589-590, 136 A.2d 341
(1957).
Colin C. Tait, Tait and LaPlante's Handbook ofConnecticut Evidence § 7.16.8(b) (2d ed 1988). The defendant's argument that plaintiff's counsel was required, at Dr. Fujita's deposition, to make an objection anticipating that defendant would fail to introduce evidence at trial to provide a basis for the opinion is unfounded. If the defendant failed to provide a foundation for Dr. Fujita's opinion, it has no one to blame but itself. As Professor Tait further states: "Whether there is a foundation in the record for a hypothetical question is an issue of fact for the trial judge." Id.
 3a-b. The trial court did not err in excluding defendant's proposed expert witnesses on insurance industry usages and customs.
 Custom or usage may not be asserted against a party unless it knew or should have known of the custom or usage.
By proposing its insurance experts, the defendant sought to show that certain terms of the insurance contract had special trade meanings by which the plaintiff was bound. Such evidence, however, is irrelevant absent additional proof that plaintiff knew or should have known of the custom or usage.
Where the question is whether the parties to a CT Page 584 contract shall be presumed to have contracted with a certain trade usage or custom in mind and, therefore, should be bound by it, no such presumption arises unless the parties knew or ought to have known of the existence of such usage. . . . Evidence of such a trade custom was, in the absence of proof that the parties knew or should have known of its existence, irrelevant to the issues of this case and its admission was error.
Sottosanto v. Lucas, 108 Conn. 521, 523 (1928), citingSmith v. Phipps, 65 Conn. 302, 308 (1894). No such evidence was offered at trial, and the proposed expert testimony was properly excluded.
This rule also finds expression in a number of other authorities. The Restatement (Second) of Contracts provides that "[A] party is not bound by a usage unless he knows or has reason to know of it. Hence a party who asserts a meaning based on usage must show either that the other party knew of the usage or that the other party had reason to know of it." Restatement (Second) of Contracts, § 220, comment b (1981). The Restatement rule has been followed in the Second Circuit, as well. Seee.g., Flower City Paining [Painting] Contractors, Inc. v. GumiaConstruction Co., 591 F.2d 162, 165 (2nd Cir. 1979) ("[a] party cannot be bound by usage unless he knows or has reason to know of its existence and nature") (citing first Restatement), Doyle Dane Bernbach, Inc. v. Avis,526 F. Sup. 117, 120 (S.D.N.Y. 1981) (citing first Restatement and Flower City, supra).
Whether a party to a contract is properly chargeable with knowledge of industry usages depends upon the extent of the party's experience in the particular trade.Sottosanto, supra, 108 Conn. at 522-23. Thus in DoyleDane Bernbach, supra, the defendant was held not chargeable with notice of an advertising industry custom regarding contract termination where the defendant did not have "regular dealings with the advertising industry or prior experience with advertising contracts."526 F. Supp. at 120. Similarly, in Flower City, supra, a "neophyte minority painting contractor" was held not chargeable with knowledge of a painters' trade custom CT Page 585 concerning the extent of work to be done under a contract. 591 F.2d at 165. See also United States v.Haas Haynie Corp. , 577 F.2d 568, 574 (9th Cir. 1978).
In the present case there were no grounds for holding Mohawk Mountain to knowledge of insurance company customs or usages. The defendant did not attempt to show that Mohawk knew or should have known of any technical usages in the insurance industry. Without such a foundation, Mohawk could not be bound by any alleged custom or usage, and any such evidence was therefore properly excluded as irrelevant and prejudicial.Sottosanto, supra, 108 Conn. at 523.
 Evidence of insurance industry custom or usage is not relevant to the expectations of the insured or the intent of the parties.
The defendant's proposed evidence was also irrelevant and prejudicial under the established canons of insurance contract construction. An insurance contract "should be construed from the perspective of a reasonable layperson in the position of the purchaser of the policy." Ceci v. National Indemnity Co., 225 Conn. 165,168 (1993). "The test of coverage is not what the insurer intended to cover, but what a reasonable person on the position of the insured would understand to be covered."Clinton v. Aetna Life Surety Co., 41 Conn. Sup. 560,563 (1991). The rule is that "[i]n construing this all-risk policy, as in construing any such insurance policies, the Court must read it as a layman, rather than an experienced underwriter would." Standard StructuralSteel Co. v. Bethlehem Steel Corp. , 597 F. Sup. 164, 190
(D.Conn. 1984) (citation omitted).
Under these rules of construction, evidence of the insurer's intent is irrelevant; the policy must be read from the perspective of the lay insured, not from the technical perspective of an experienced insurer. The question for the jury was not what the defendant meant by its policy, but what a reasonable insured in the position of Mohawk Mountain would have understood it to mean. Evidence of the insurer's special understanding of its own contract terms was therefore properly excluded as irrelevant. See Holiday Homes of St. John v. Lockhart, CT Page 586678 F.2d 1176, 1184-85.
A second rule of interpretation, also relevant here is that an insured cannot be bound by the unilateral intent of the insurer. The only relevant intent is that expressed in the contract itself: "The effect of the contract must be determined by the intent expressed in it and not by an extraneous intent which may be claimed or believed to have been in the minds of the parties."Leathermode Sportswear, Inc. v. Liberty Mutual InsuranceCo., 150 Conn. 63, 66 (1962). See also Lyon v. AetnaCasualty Surety Co., 140 Conn. 304, 311 (1953); Hanselv. Hartford-Connecticut Trust Co., 133 Conn. 181, 194
(1946). The written agreement is the guide to interpretation, not the special meanings attached to the language by one side only: "In situations where the parties have their agreement in writing, their intention is to be determined from its language and not on the basis of any intention either may have secretly entertained." Sturman v. Socha, 191 Conn. 1, 10 (1983) (internal quotation marks omitted), citing RobertLawrence Associates, Inc. v. Del Vecchio, 178 Conn. 1, 14
(1979) and Didriksen v. Havens, 136 Conn. 41, 48 (1949). The insurance contract at issue must be read according to its written terms, not according to the irrelevant evidence of what the insurer alone intended. See also IraS. Bushey Sons v. American Insurance Co., 237 N.Y. 24,143 N.E. 340 (N.Y. 1923), reh. den. 237 N.Y. 536,143 N.E. 732, (insurers evidence of custom properly excluded).
In the present case, testimony as to the technical usages of the insurance trade was irrelevant to the question of the intent of the parties, and was properly excluded. It should be further noted that defendant objected to plaintiff's offer of evidence as to its understanding or intent with respect to the policy and such evidence was excluded.
 4. The trial court properly excluded the Storm Data Report as an exhibit.
The defendant alleges that it was "prejudiced . . . from presenting additional information [sic] contained in the [Storm Data Report, Ex. 54a-54b for ID] CT Page 587 by a qualified expert who relied on the information and therefore not hearsay" [sic]. Defendant cites Tait and LaPlante's Handbook of Connecticut Evidence, § 7.16.8(c) and § 7.16.8(d). Those sections discuss how expert opinions may be based on hearsay and on "learned treatises". Neither argument, however, helps the defendant. The trial court properly exercised its discretion to exclude the document, because it contained inadmissible multiple hearsay, and could not be deemed a "learned treatise". It was therefore not admissible as a full exhibit.
The defendant also argues that the "Storm Data Report" is admissible because it "contained the official seal of the United States Government", and was thus "self-authenticating". Defendant's claim of "authenticity", however, is beside the point. At trial, the plaintiff did not dispute the fact that the document bears on its face an official's signature, certifying that the document, "Volume 31, No 7, Storm Data with Late Reports/Corrections" dated July 1989 is an "official publication" of the National Oceanic and Atmospheric Administration, "compiled" from information received" from unknown informants. It is not admissible pursuant to either the public records or business records exceptions to the hearsay rule. The claim that it is also admissible as a "learned treatise" is unfounded.
At trial, the defendant could not meet the fundamental requirements for admissibility by showing that the document was made by an official legally required to keep such records, that the records were made in the course of his official duties, and that he had personal knowledge of the matters contained in the record. Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33,38 (1978). The rule is well established that information in a public record obtained from an unofficial source is admissible only if it falls within another hearsay exception. See e.g. State v. Milner,206 Conn. 512, 520-521 (1988). The court did not abuse its discretion in excluding the exhibit. The foundation requirements were not met.
The document offered consists of extracts: pp. 25 and 26 contain annotated tables labeled "Storm Data and CT Page 588 unusual weather phenomena", with dates, places, names and unidentified statements about weather conditions and "estimated damages": pp. 9-10 contain photographs captioned "Tornado at Hamden, Connecticut on July 10, 1989", labeled as "by Christopher Cappella of East Haven, Connecticut" (otherwise unidentified); p. 73, "Reference Notes", contains a disclaimer as follows: "When reports are not received or are incomplete, the Storm Summary National Death and Injury totals may also be incomplete." Aside from the credit for the photographs on pp. 9 and 10, there is no indication whatsoever as to the identities of any of the reporters who supplied the information, or who "compiled" the notes about the "unusual weather phenomena", whether officials under a legal duty to report, with first-hand knowledge, or anonymous volunteers.
On its face, the document offered is replete with multiple hearsay information from unidentified informants, and certified only as a "publication. . . compiled from information received" by "extensive data collection efforts" of weather-watchers in various states. There was no foundation, and can be no corroboration, for defendant's claim that the document was produced by a public official in the ordinary course of his duties with personal knowledge of the matters contained therein. That claim simply cannot be true. For example, the data presented on page 25 of the document covers the entire State of Colorado, including reports dated July 14, 15, 16, 20, 22, 26, 27, 28, 29, 30, 32, for locations in twenty-two counties, typically with brief notes — ("Lightning hit a home in Littleton, setting a bed on fire. Damage was confined to the bedroom"). Whoever the unnamed reporters were, the document is silent as to their official or unofficial status, and the extent of their "personal knowledge" or observation of any of the events reported. The report is not simply a compilation of rainfall data, it is filled with evaluative comments whose trustworthiness cannot be determined. ("Lightning struck a $250,000.00 home near Nederland and started a fire which destroyed all of it except two garages.")
In order to be admissible as a public record or a business record, the information contained in the CT Page 589 proffered document must be based on the personal knowledge of the declarant. Heritage Village MasterAss'n. Inc. v. Heritage Village Water Co., 30 Conn. App. 693,701 (1993) ("Unless the agency conducted its own testing or examination, the conclusions contained in a state agency decision are hearsay and are not admissible to prove their truth"); Filisko v. Bridgeport HydraulicCo., 176 Conn. 33, 38 (1978); D'Amato v. Johnston,140 Conn. 54, 59-60 (1953). Similarly, information contained in a public record obtained from an unofficial source is admissible only if it falls within another hearsay exception, such as an admission of a party, or a declaration against interest. In short, the public record exception is not broader than the exception for business records. See Filisko, supra, 176 Conn. at 38. Both require that the information contained be based on the personal knowledge of an official with the duty to record such information. Tait and LaPlante, Handbook ofConnecticut Evidence, § 11.15.3.
 To be admissible, the business record must be one based upon entrant's own observation or upon information transmitted to him by an observer whose business duty was to transmit it to him . . . [T]o permit the receipt in evidence of entries based upon voluntary hearsay statements made by third parties not engaged in the business or under any duty in relation thereto [is error].
Sheary v. Hallock's of Middletown, Inc., 149 Conn. 188,195 (1962); see also State v. Milner, supra,206 Conn. at 520-21 (anonymous telephone call contained in police report inadmissible).
The trial court refused to admit the Storm Data Report in evidence as a full exhibit, since it could not qualify under any exception to the hearsay rule. Furthermore, while an expert may base his opinion on sources not in themselves admissible, Tait and LaPlante emphasizes that:
 It should be stressed that such hearsay information is used solely to show the bases for the expert opinion, and is not CT Page 590 independently admissible, unless within a recognized hearsay exception. Schaeffer, Jr. Inc., Co. v. Ely, 84 Conn. 501, 508 (1911); Brown v. Blauvelt, 152 Conn. 272, 274 (1964).
Handbook of Connecticut Evidence, § 7.16.8 at p. 183.
Under Connecticut law, the facts of an official report are admitted only if the report was made pursuant to a legal duty to report and is based on personal knowledge of the matters in the record. At trial, the defendant could not establish either fact as to the anonymous declarants of the Storm Data Report.
Nor is the "learned treatise" exception available, despite defendant's post-trial claim. Even if the definition of "learned treatise" were stretched to cover these anonymous weather-watchers's raw reports, the "learned treatise" rule provides that such treatises are not independently admissible as substantive evidence, and may be used solely to corroborate an expert's oral testimony. When a "learned treatise" is offered in connection with expert testimony, the court may minimize the danger of misunderstanding or misapplication by the jury, and ensure that jurors will not be unduly impressed by a published text, by judicious exercise of discretion in deciding which items ought to be admitted as full exhibits. Cross v. Huttenlocher, 185 Conn. 390, 397
(1981) (affirming trial court's exclusion of excerpts from medical text because of risk that jury would be confused or misled). In this case, the trial court refused to allow the Storm Data Report in evidence as a full exhibit to be taken into the jury room. The "additional information" contained therein was inadmissible on its face.
 5. The trial court correctly allowed plaintiff to offer evidence relevant to damages caused by defendant's wrongful detention of money.
At trial, defendant did not object to the court's instruction to the jury regarding the award of prejudgment interest. Such an award was made. Defendant now claims that it was error to allow plaintiff to introduce evidence that it was forced to borrow money — CT Page 591 and incur interest costs — as a result of defendant's breach of the insurance contract.
Even though no testimony was permitted as to the amount of plaintiff's loans, or the total interest costs paid, defendant now alleges that it was "prejudiced" because the court allowed "irrelevant evidence" of plaintiff's borrowing to be presented. The plaintiff argued, and the court agreed, that the plaintiff could present evidence of the damage which flowed from defendant's wrongful detention of insurance proceeds. The relevance of plaintiff's loans to that issue is self-evident.
There can be no dispute that "interest, as an element of damages, is a factual question within the province of the jury", John T. Brady, Inc. Co. v.Stamford, 220 Conn. 432, 445 (1991), and that the jury's award of statutory interest pursuant to § 37-3a, Conn. Gen. Stat., requires it to find that the money was wrongfully detained. Associated Catalog Merchandisers,Inc. v. Chagnon, 210 Conn. 734, 748 (1989); Alderman v.RPM of New Haven, Inc., 20 Conn. App. 566, 569 (1990). "Wrongfulness" has not been defined by our courts, but the consensus of the cases is that it should be determined "in view of the interests of justice.Middlesex Mutual Ins. v. Walsh, 218 Conn. 681 (1991).
The plaintiff offered testimony to the fact that it borrowed money to rebuild — but not how much. That evidence goes directly to the issue of whether the plaintiff was entitled to a jury award of statutory prejudgment interest "in view of the interests of justice", when the jury found that the insurance proceeds had been wrongfully detained. "The question of interest on damages is inextricably mixed with the merits of the underlying claim." Canton Motorcar Works, Inc. v.DiMartino, 6 Conn. 447, 464 (1986), cert. denied,200 Conn. 802 (1986) . The jury must decide "whether the detention of the money is wrongful under the circumstances and whether justice requires the allowance of interest as damages for the loss of use of money."Id. See also West Haven Sound Development Corporation v.West Haven, 207 Conn. 308, 321 (1988); Southern NewEngland Contracting Co. v. State, 165 Conn. 644 (1974). There can be no question as to the relevance of CT Page 592 plaintiff's resort to bank loans when defendant denied its claim.
We agree that "relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." Tait and LaPlante, Handbookof Connecticut Evidence § 8.1.1. The issue for which plaintiff claimed that its need to borrow money was relevant is the issue of fundamental fairness, on which the jury's award of prejudgment interest turned. The defendant did not object to the court's charge to the jury which asked them to answer the question whether the interests of justice require that Mohawk Mountain be compensated for losing the use of the money withheld by American Home. Plaintiff's evidence on that point was properly admitted.
 III Defendant has failed to establish that the jury charge contained any harmful error.
The defendant makes seven claims of error with respect to the Court's charge to the jury (See Defendant's Motion #6-12). For the reasons set forth, none of defendant's claims provide grounds for setting aside the verdict in this case.
Setting aside a verdict for misstatements in the jury charge must be done with great caution and only if the judge is entirely satisfied, upon authoritative or statutory basis, that he has committed unmistakable error that has caused unquestionable harm. Sciola v. Shernow,22 Conn. App. 351, cert. denied 216 Conn. 815 (1990). Further, "jury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." Kelley v. Bonney, 221 Conn. 549,584 (1992).
 6. The trial court did not improperly charge the jury that if it finds the contract ambiguous, it was to interpret the policy most favorably to the insured.
CT Page 593
The court stated the law in its charge:
 The Connecticut rule of construction of an insurance policy is well settled. If the terms of an insurance policy are of doubtful meaning, then permissible construction which is most favorable to the insured is to be adopted; but if they are plain and unambiguous, the established rule for contracts apply. The language from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning, and the courts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties.
Charge to the Jury (Pickett, J.) page 14, Appendix A attached.
In this regard the court gave the jury a correct statement as to the law regarding insurance policies. The court did not instruct the jury to determine whether the contract was ambiguous, nor did it instruct the jury to interpret the contract in any way. (Appendix A). The above quoted statement was a preamble to the court's instructions regarding the definition of occurrence. In its definition of "occurrence" the court instructed the jury that the policy did not provide a definition of "occurrence"; and then supplied the jury with the definition of "occurrence" to be applied to the facts of the case. The jury was not requested to, nor did it, interpret the policy. The disputed portion of the charge merely provided a transition from the fact that the policy provided no definition of "occurrence" to the court's providing such definition. It was a wholly accurate statement of the law and was, at worst, harmless surplusage. In deciding whether a jury charge was fair and accurate, each of the trial court's statements are not examined in a vacuum but in the context of the entire charge. Bank of Boston v. Ciarleglio, 26 Conn. App. 503,cert. denied, 221 Conn. 922 (1992).
 7. The trial court did not err in charging the jury on occurrence and refusing to adopt defendant'sCT Page 594 request to charge number 12.
Defendant bases this assignment of error on its assertion that the court should not have applied the law of Newmont Mines Ltd. v. Hanover Insurance Co., 784 F.2d 127
(2d Cir. 1986) to this case. This argument is difficult to fathom, however, since defendant's own request to charge number 12 cites Newmont Mines as part of its authority. (Defendant's Supplemental Request to Charge dated November 21, 1994). The defendant cannot be heard to complain about the court's choice of authority. Beyond this assertion, the defendant does not explain exactly what was objectionable about the court's charge on "occurrence." Most notably, the defendant does not present any argument about why Newmont should not apply to this case.
The charge itself was fully in accord with Newmont. In evaluating the definition of "occurrence" the Newmont
trial court inquired whether there was a causal connection between one item of damage and the other. In upholding the trial court's jury instruction on occurrence, the appellate court in Newmont relied heavily upon the difference between liability policies and policies against property damage in construing the term "occurrence." Under a liability policy, it held, occurrences are evaluated with an eye toward the cause rather than the effect: "In the liability context, we have found that the selection of a `per occurrence' basis and the corresponding rejection of a `per claim' basis indicated that the liability policy was not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claims for damages." 784 F.2d 136.
In the context of property insurance, however, the expectations of the parties are different, and therefore the evaluation of "occurrence" must also be different: "The goal of such a policy, simply stated, is to provide financial protection against damage to property. In accordance with this purpose, the parties must have intended to provide coverage for property damage each time it occurred unexpectedly and without design, unless the damage occurring at one point in time was merely part CT Page 595 of a single, continuous event that had already caused other damage." 784 F.2d at 136. The court went on to affirm the judgment below that there were two occurrences: though the damage was all caused by snow from the same storm, the portions of the building that collapsed were structurally distinct, the collapse of one part did not cause or contribute to the collapse of the other part, and the collapses occurred anywhere from three to seventeen days apart. The trial court's instructions were therefore upheld.
Because the court's charge was in accord with this case authority and tailored to the particular circumstances of this case, it was legally valid: "Since the charge was sufficiently correct in law, adapted to the issues and ample for the guidance of the jury, it met the required test." DeCarufel v. Colonial Trust Co.,143 Conn. 18, 20 d(1955). Defendants claim to the contrary is unavailing.
Further, there is no support in Newmont for defining occurrence as "damage which results from the continuous or repeated exposure to the same or similar circumstances" — the definition requested by defendant in its proposed instruction number 12. In fact this definition was rejected by the Newmont court because it arises in the liability insurance context and because the policy at issue in Newmont — as in the Mohawk case — does not contain any definition of "occurrence."784 F.2d at 136, n. 8. The meaning of "occurrence," as stated by the Newmont court, must be interpreted in the context of the specific policy and facts of the case. Newmont,784 F.2d at 136, n. 9.
The defendant misinterprets this case by making the relevant question the singularity or continuousness of the cause of the damage. The more faithful approach to the case is to focus instead on the distinctness or separability of the actual incidents of damage. Under this case the question of one or two storms is unimportant. The real question is whether the two separate items of damage were causally related to each other, i.e., whether the individual items of damages are separable in time or space, or whether one contributed to the other. The trial court's instruction was therefore CT Page 596 correct.
 8. The trial court did not commit harmful error by referring to plaintiff's exhibits 16, 17, 20 and 21 with regard to the jury's determination of damages.
The trial court has both a right and duty to comment on the evidence. (See Appendix A — Charge to Jury, page 4, Pickett, J. 12/14/94). Bank of Boston v. Ciarleglio,26 Conn. App. 503, cert. denied, 221 Conn. 922 (1992). Further, "the court may choose whether to discuss particular items of testimony or specific facts in its charge. Although this discretion is subject to some appellate oversight, we will not disturb the trial court's jury charge unless it is demonstrated that the court's discretion has been abused to the manifest injury of a litigant." Giannitti v. Stamford, 25 Conn. App. 67,73 (1991). See also Bruneau v. Quick, 187 Conn. 617, 627
(1982).
The plaintiff's exhibits 16 and 17 were two original proofs of loss submitted by plaintiff in 1989 which allocated certain damages to each of two tornadoes. Testimony was elicited from Carol Lugor that the allocation of damages on exhibits 16 and 17 were to some extent inaccurate. Exhibits 20 and 21 were introduced to correct errors in exhibits 16 and 17. The parties had stipulated to the dollar amount of each item of damage, leaving to the jury the question of allocating the items to one of the two occurrence, if they found two occurrences. There was testimony by plaintiff as to the basis of the allocations of damages to each tornado. The court in its charge merely pointed out the original proofs of loss and that plaintiff had amended those proofs by exhibits 20 and 21. It did not comment on the underlying evidence with respect to how the plaintiff had made the allocation of damages, or whether the evidence supported such allocation.
 In deciding whether a jury charge was fair and accurate, we do not examine each of the trial court's statements in a vacuum. Rather, we assess the court's comments in the context of the entire charge in order to determine CT Page 597 whether they fairly and accurately recount the evidence. State v. LaCasse, 9 Conn. App. 79, 85, cert. denied, 201 Conn. 815 (1986).
The court's comments with respect to these exhibits were fair and did not mislead the jury.
 9-12. The trial court did not commit harmful error by failing to give a charge on "risk", "loss", "the plaintiff's knowledge and understanding of the policy" and "source of damages.
A request to charge must be an accurate statement of the law. Defendant's Request to Charge on "risk" and "source of damages" has no basis in law and should not have been given.
The defendant contends that it is proper for the court in this case first to define "risk" and second to restrict that definition to "windstorm". While the policy at issue is generically an "all risk" policy, the word "risk" is not a contract term, and for that reason alone, it should not be construed by the court. "A court cannot rewrite the policy of insurance or read into the insurance contract that which is not there." Hammer v.Lumberman's Mutual Casualty Co., 214 Conn. 573, 591
(1990).
Moreover, the fact that the contract is an "all risk" policy requires the application of interpretive rules directly opposed to the kind of narrow definitions that defendant sought in its request to charge. "[T]he language of all risk policies is not to be given a restrictive meaning." Standard Structural Steel Co. v.Bethlehem Steel Corp. , 597 F. Sup. 164, 191 (D.Conn. 1984). In fact, an "all risk" policy can cover a multitude of fortuitous events, and by its very nature affords broader coverage than can be encompassed by a reductive definition of risk. "A policy of insurance insuring against `all-risks' is to be considered as creating a special type of insurance extending to risks not usually contemplated, and recovery will usually be allowed, at least for all losses of a fortuitous nature, in the absence of fraud . . . unless the policy contains a CT Page 598 specific provision expressly excluding the loss from coverage." Standard Structural Steel,597 F. Supp. at 191, citing Annotation: Coverage Under "All Risks"Insurance, 88 A.L.R.2d 1122, 1125 (1963). Under an all risk policy "An insurer shall extend coverage when these following four conditions are met: (1) the loss must be fortuitous . . . (2) the loss . . . must result from at least one extraneous cause . . . (3) the loss or damage must not result from the . . . fraud of the insured . . . [and] (4) the risk must be lawful." Standard Structural Steel,597 F. Supp. at 191, citing Avis v. Hartford Fire Ins.Co., 283 N.C. 142, 195 S.E.2d 545, 549.
This means that an insured seeking coverage under an all risk policy need not prove the exact cause of the damage, so long as the other conditions are met. "[T]he all risk insured has generally met his burden of proof by establishing, using the four elements just cited, `a fortuitous loss within the comprehensive coverage thoughnot proving exactly what caused it." Standard StructuralSteel, 597 F. Supp. at 192, citing Keeton, InsuranceLaw, § 5.1(b)(2) at 271 (1971) (emphasis added). Therefore, under the all risk policy at issue, the question is not whether the losses were caused by a windstorm, a hailstorm, a snowstorm, or any other kind of storm. The issue is simply how many occurrences there were. This question is to be answered by the court defining for the jury the term "occurrence" and the jury making appropriate findings of fact, not by imposing an unlawfully narrow definition of "risk" which excluded all causes but windstorms from the coverage.
Finally, absent any specific mention of "windstorms" in the policy, the contract is to be construed in accordance with the expectations of the insured. "In construing this all-risk policy, as in construing any such insurance policies, the court must read it as a `layman, rather than an experienced underwriter would,'"Standard Structural Steel, 597 F. Supp. at 190 (citation omitted). See also Ceci v. National Indemnity Co.,225 Conn. 165, 168 (1993); Clinton v. Aetna Life SuretyCo., 41 Conn. Sup. 560, 563 (1991). From a layman's perspective an "all risk" policy would provide considerably broader coverage than that allowed by defendant's overly narrow proposal of "windstorm," CT Page 599 especially since windstorms are nowhere mentioned in this all-risk policy. And it is the layman's perspective that must guide the interpretation of the contract.
Regarding defendant's proposed charge on "loss," while the term "loss" is a term in the contract, defendant's request to charge on the definition of "loss" added nothing to the jury's understanding of what it was to decide.
Defendant's request to charge stated:
 A loss under the policy is an injury or damage sustained by the insured in consequence of happening of a misfortune against which insurer has undertaken to indemnify the insured or a pecuniary injury resulting from the occurrence of the contingency insured against. Black's Law Dictionary (6th Ed. 1990); Ocean Accident Guarantee Corporation v. Southwestern Bell Telephone Co., 100 F.2d 441
(8th Cir. 1939).
In the court's charge on "occurrence", the term "loss" is used and in context, clearly means damage sustained by Mohawk ["losses which occurred" used interchangeably with "damage to property"] as a result of an occurrence insured against ["whether the losses sustained by Mohawk constituted more than one occurrence,. . . if you find the damage incurred was a single continuous event or incident, then the loss constitutes a single occurrence"].
No evidence was offered to indicate any dispute between the parties as to the meaning of "loss" or the extent of the losses incurred. "It is a well established rule that the charge to the jury must be read as a whole and that individual instructions are not to be judged in `artificial isolation' from the overall charge. Mazzuccov. Krall Coal Oil Co., 172 Conn. 355, 357 (1977). To the extent that the term "loss" was relevant at all in the jury charge, the substance of defendant's charge was presented in the request to charge on "occurrence."
Regarding defendant's proposed charge on CT Page 600 "plaintiff's knowledge of the policy," this charge was not relevant to the issues of the case. Defendant offered the following supplemental request to charge which the court declined to give:
Knowledge of policy by plaintiff:
 The insured is charged with having knowledge of the policy and having read its provisions. Once the policy is accepted by the insured, which plaintiff has admitted, it cannot complain that it did not read on know the terms of the policy. 1 Couch on Insurance, § 12:16, p. 807.
 Instead, even if a person does not speak English they are charged with knowing the contents of the policy and bound by its terms. Bahr v. Prudential Ins. Co., 5 Conn. Cir. Ct. 620, 627-28 (1969).
The court made clear in sustaining objections and striking testimony that what Carol Lugor or Steve Hedden understood or thought Mohawk's insurance policy covered was entirely irrelevant. All such testimony was struck at trial except to the minor intent that it related to plaintiff's explanation as to why plaintiff did not describe the two occurrences to Bo Adman at the initial meeting after July 10, 1989]. As defendant's charge on "plaintiff's knowledge of the policy" was not relevant, the court correctly declined to give it.
 13. The trial court did not err in refusing to submit defendant's proposed interrogatories number 1, 2, and 4 to the jury.
The trial court is vested with broad discretion in deciding whether to submit proposed jury interrogatories.Ubysz v. DiPietro, 185 Conn. 47, 61 (1981, Tomczuk v.Alvarez, 184 Conn. 182, 186 (1981). Interrogatories may be refused where they might tend to confuse or perplex the jury in rendering their verdict. Hammer v. MountSinai Hospital, 25 Conn. App. 702, 708d (1991) citingFreedman v. New York, N.H. H.R. Co., 81 Conn. 601, 614
(1909). Moreover, the fact sought to be elicited by an CT Page 601 interrogatory must be pertinent to some issue, and one which may be of material weight in deciding it. Hammer,
supra, 25 Conn. App. at 709.
The exclusion of defendant's proposed interrogatories was proper under these rules. The excluded interrogatories called for findings on whether or not a single storm took place (#1), whether one storm front was present (#2), and whether more than one tornadic thunderstorm caused damage to Mohawk Mountain (#4). None of these facts were pertinent or material to the only questions in the case which were the number of occurrences and the amount of damages. The interrogatories were therefore properly excluded.
 IV
For all the reasons set forth herein, the defendant's motion to set aside the verdict is denied.
PICKETT, J.
APPENDIX "A"
NO. CV-91-0056905S : SUPERIOR COURT MOHAWK MOUNTAIN SKI AREA, INC. : JUDICIAL DISTRICT VS. : OF LITCHFIELD AMERICAN HOME ASSURANCE CO. : DECEMBER 14, 1994
JURY CHARGE
BEFORE:
 THE HONORABLE WALTER M. PICKETT, JR., JUDGE, AND A JURY OF EIGHT
APPEARANCES:
 CHARLES B. PRICE, ESQ. ATTORNEY FOR THE PLAINTIFF
 EDWARD W. GASSER, ESQ. ATTORNEY FOR THE DEFENDANT
REPORTED BY: CT Page 602
 KIMBERLY R. BECK CERTIFIED SHORTHAND REPORTER SUPERIOR COURT 15 WEST STREET — P.O. BOX 131 LITCHFIELD, CT 06759 567-4263
14 POLICY AND THAT THEY ARE ENTITLED TO RECOVER UNDER THE POLICY.
THE CONNECTICUT RULE OF CONSTRUCTION OF AN INSURANCE POLICY IS WELL SETTLED. IF THE TERMS OF INSURANCE POLICY ARE OF DOUBTFUL MEANING, THEN PERMISSIBLE CONSTRUCTION WHICH IS MOST FAVORABLE TO THE INSURED IS TO BE ADOPTED; BUT IF THEY ARE PLAIN AND UNAMBIGUOUS, THE ESTABLISHED RULE FOR CONTRACTS APPLY. THE LANGUAGE FROM WHICH THE INTENTION OF THE PARTIES IS TO BE DEDUCED MUST BE ACCORDED ITS NATURAL AND ORDINARY MEANING, AND THE COURTS CANNOT INDULGE IN A FORCED CONSTRUCTION IGNORING PROVISIONS OR SO DISTORTING THEM AS TO ACCORD A MEANING OTHER THAN THAT EVIDENTLY INTENDED BY THE PARTIES.
AS I INDICATED NO DEFINITION OF OCCURRENCE IN THIS POLICY. NOW, IN THIS INSURANCE POLICY, IS A MONETARY LIMITATION IN THE AMOUNT THAT CAN BE RECOVERED PER OCCURRENCE OF SIX HUNDRED AND FIFTY THOUSAND DOLLARS, AND IT IS FOR YOU TO DECIDE WHETHER OR NOT THE LOSSES WHICH OCCURRED WERE THE RESULT OF ONE OCCURRENCE OR MORE THAN ONE OCCURRENCE.
THE INSURANCE POLICY DOES NOT PROVIDE ANY DEFINITION OF OCCURRENCE. THE TERM OCCURRENCE ORDINARILY IS UNDERSTOOD TO DENOTE SOMETHING THAT TAKES PLACE, ESPECIALLY SOMETHING THAT HAPPENS UNEXPECTEDLY AND WITHOUT DESIGN.
THE INSURANCE POLICY INVOLVED IN THIS CASE IS A PROPERTY DAMAGE POLICY. THE GOAL OF SUCH A POLICY SIMPLY 15 STATED IS TO PROVIDE FINANCIAL PROTECTION AGAINST DAMAGE TO PROPERTY. IN ACCORDANCE WITH THIS PURPOSE, THE PARTIES HERE MUST HAVE INTENDED TO PROVIDE COVERAGE FOR PROPERTY DAMAGE EACH TIME IT OCCURRED UNEXPECTEDLY AND CT Page 603 WITHOUT DESIGN, UNLESS THE DAMAGE OCCURRING AT ONE POINT IN TIME WAS MERELY PART OF A SINGLE CONTINUOUS EVENT THAT HAD ALREADY CAUSED DAMAGE.
THE MERE FACT THAT THE VARIOUS ITEMS OF DAMAGE TO PLAINTIFF'S PROPERTY MAY HAVE BEEN CAUSED BY THE SAME STORM DOES NOT MEAN THAT THEY WERE THE RESULT OF THE SAME OCCURRENCE.
IN CONSIDERING WHETHER THE LOSSES SUSTAINED BY MOHAWK CONSTITUTED ONE OR MORE THAN ONE OCCURRENCE, YOU MAY CONSIDER ALL EVIDENCE YOU DEEM RELEVANT TO THE ISSUE. FOR EXAMPLE, IF YOU FIND THAT THE ITEMS OF DAMAGE OCCURRED AT DIFFERENT TIMES, THIS MAY BE EVIDENCE THAT THE ITEMS OF DAMAGE WERE THE RESULT OF DIFFERENT OCCURRENCES; IF YOU FIND THAT THE ITEMS OF DAMAGE WERE TWO INDEPENDENT STRUCTURES, THIS MAY BE EVIDENCE THAT THE ITEMS OF DAMAGE WERE THE RESULT OF DIFFERENT OCCURRENCES; IF YOU FIND THAT DAMAGE TO ONE STRUCTURE DID NOT CAUSE OR CONTRIBUTE TO THE DAMAGE TO ANOTHER STRUCTURE OR STRUCTURES, THIS MAY BE EVIDENCE THAT THE ITEMS OF DAMAGE WERE THE RESULT OF DIFFERENT OCCURRENCES.
IF YOU FIND THAT THE DAMAGE TO MOHAWK CONSTITUTED SEPARATE EVENTS OR INCIDENTS, THEN THERE WERE TWO OCCURRENCES. IF ON THE OTHER HAND, YOU FIND THAT THE 16 DAMAGE INCURRED WAS A SINGLE CONTINUOUS EVENT OR INCIDENT, THEN THE LOSS CONSTITUTES A SINGLE OCCURRENCE AND THERE WILL BE NO RECOVERY.
NOW, DURING ARGUMENT MR. PRICE EXHIBITED A CHART TO YOU. YOU ARE CAUTIONED THAT THESE CHARTS ARE NOT EVIDENCE, BUT ONLY ARGUMENTS BY COUNSEL, AND IT IS NOT TO BE CONSIDERED BY YOU AS EVIDENCE. ANY AMOUNT TO BE AWARDED TO THE PLAINTIFF IN THIS CASE IS A MATTER FOR YOUR CONSIDERATION, AND YOU SHOULD AT ALL TIMES BE FAIR AND REASONABLE IN WHATEVER YOU MAY DETERMINE THAT FIGURE TO BE. THE GENERAL RULE IS THAT INSOFAR AS YOU CAN DO IT, THE PLAINTIFF IS TO GET A FAIR AND JUST COMPENSATION TO HER INSOFAR AS MONEY WILL COMPENSATE THE PLAINTIFF FOR THE INJURES THE PLAINTIFF HAS SUFFERED.
NOW, UNLESS AND UNTIL YOU COME TO THE CONCLUSION THAT THE DEFENDANT BREACH THE CONTRACT AND SUCH BREACH CT Page 604 WAS THE PROXIMATE CAUSE OF THE CLAIMED DAMAGES, YOU HAVE NO OCCASIONS WHATSOEVER TO CONSIDER THE QUESTIONS OF DAMAGES.
I SPEAK OF DAMAGES ONLY BECAUSE THERE IS LAW IN CONNECTION THEREWITH WHICH I MUST GIVE YOU IN THE EVENT YOU GET TO THAT IN YOUR CONSIDERATIONS. IF YOU DO COME TO THE CONCLUSION THAT THE DEFENDANT WAS RESPONSIBLE AND SUCH BREACH WAS THE CAUSE OF THE DAMAGES, THEN YOU WILL TURN TO THE QUESTION OF DAMAGES. IN THAT REGARD, JUST AS IN REGARD TO EVERY OTHER DISPUTED MATTER BEFORE YOU, YOU CAN AWARD THE PLAINTIFF DAMAGES ONLY AS THEY ARE
APPENDIX "B"
NO. CV-91-0056905S : SUPERIOR COURT MOHAWK MOUNTAIN SKI AREA, INC. : JUDICIAL DISTRICT VS. : OF LITCHFIELD AMERICAN HOME ASSURANCE CO. : DECEMBER 14, 1994
JURY CHARGE
BEFORE:
 THE HONORABLE WALTER M. PICKETT, JR., JUDGE, AND A JURY OF EIGHT
APPEARANCES:
 CHARLES B. PRICE, ESQ. ATTORNEY FOR THE PLAINTIFF
 EDWARD W. GASSER, ESQ. ATTORNEY FOR THE DEFENDANT
REPORTED BY:
 KIMBERLY R. BECK CERTIFIED SHORTHAND REPORTER SUPERIOR COURT 15 WEST STREET — P.O. BOX 131 LITCHFIELD, CT 06759 567-4263
4 CT Page 605
IT IS YOUR DUTY TO FOLLOW MY INSTRUCTIONS AND CONSCIENTIOUSLY APPLY THE LAW AS I GIVE IT TO YOU TO THE FACTS YOU FIND TRUE IN ORDER TO ARRIVE AT A VERDICT. IF YOU HAVE A DIFFERENT IDEA OF WHAT THE LAW IS AND WHAT YOU FEEL IT SHOULD BE, YOU SHOULD DISREGARD YOUR NOTIONS AND APPLY THE LAW AS I GIVE IT.
IF THE LAW IN ANY WAY DIFFERS FROM THE COMMENTS MADE BY COUNSEL, YOU WILL DISMISS FROM YOUR MINDS WHAT THEY MAY HAVE SAID. YOU WILL DETERMINE WHAT THE FACTS ARE BY A CAREFUL CONSIDERATION OF ALL THE EVIDENCE, GIVING TO EACH PART THE WEIGHT YOU FEEL IT DESERVES.
IT IS MY RIGHT TO MENTION THE EVIDENCE. WHERE I DO MAKE SUCH COMMENTS, THEY ARE MERELY SUGGESTIVE TO YOU TO APPROVE OR DISAPPROVE IN THE EXERCISE OF YOUR JUDGMENT.
IF I SHOULD REFER TO CERTAIN FACTS OR CERTAIN EVIDENCE IN THE CASE, YOU ARE NOT TO ASSUME THAT I MEAN THEREBY TO EMPHASIZE PARTICULARLY THOSE FACTS OR THAT EVIDENCE, NOR MUST YOU LIMIT YOUR CONSIDERATION ONLY TO THEM. SHOULD I OVERLOOK ANY EVIDENCE IN THE CASE, YOU WILL SUPPLY IT FROM YOUR OWN RECOLLECTION, AND SHOULD I INCORRECTLY STATE ANY EVIDENCE IN RELATION TO YOUR OWN RECOLLECTION, THEN YOU WILL CORRECT MY ERROR AND APPLY YOUR OWN RECOLLECTION.
WHATEVER EITHER COUNSEL MAY HAVE SAID TO YOU AS FACTS OR THE EVIDENCE SHOULD ONLY HAVE WEIGHT AS THEIR RECOLLECTION AGREES WITH YOURS. OTHERWISE, IT IS YOUR RECOLLECTION THAT APPLIES.